# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| APRIL CADENA | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:16-CV-00209 |
| | ) | |
| EL PASO COUNTY, | ) | |
| CORIZON HEALTH, INC., and | ) | |
| ALEX SALAZAR, M.D., | ) | |
| | ) | |
|     Defendants. | ) | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff April Cadena complains of Defendant El Paso County, Defendant Corizon Health, Inc., and Defendant Alex Salazar, M.D., and for cause of action respectfully shows the Court as follows:

### I. Introduction

1.    This lawsuit is brought pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. §12101 et seq. ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Rehabilitation Act"), and 42 U.S.C. §1983 ("Section 1983"). Mrs. Cadena was a prisoner in the downtown El Paso County Detention Facility. While incarcerated she suffered severe injuries, pain, emotional distress, and mental anguish because of the Defendants' failure to accommodate her disability, discrimination because of her disability, deliberate indifference to her serious medical needs, and violations of her first amendment rights to freedom of speech and right to petition.

### II. Jurisdiction and Venue

2.    This court has jurisdiction pursuant to 28 U.S.C. §1331 (federal question) and §1343 (civil rights).

3. Venue is proper in the Western District of Texas pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

### III. Conditions Precedent

4. Mrs. Cadena has complied with all conditions precedent in this case, if any, and exhausted all applicable administrative prerequisites, if any, or they have been waived.

### IV. Parties

5. Plaintiff April Cadena is a citizen of the United States of America. At all times material Mrs. Cadena was a prisoner in the custody of the El Paso County Sheriff.

6. Defendant El Paso County is a political subdivision of the State of Texas that can be served with process by serving County Judge Veronica Escobar at the Office of the County Judge, 500 East San Antonio, Suite 301, El Paso, Texas 79901, or wherever she may be found. At all times material the County had a legal duty to provide safe and suitable jails. The County constructed the Downtown Jail, funds its operation, and with its Sheriff, staffs it. The jail is administered, operated, and kept for the County by the El Paso County Sheriff. At all times material the Sheriff had a legal duty to safely keep all prisoners committed to the jail. The County and Sheriff's legal duties include budgeting for prisoners' medical needs and providing adequate medical care to all prisoners confined in the jail or kept under guard. While prisoners are ultimately responsible for their medical bills, the County must pay for the medical care provided to its prisoners until such a time as it can be reimbursed. Despite the County's contract for Defendant Corizon Health, Inc. to provide prisoners with adequate medical care, the legal duties of the County and its Sheriff are non-delegable.

7. Defendant Corizon Health, Inc. is a corporation doing business in Texas that may be served with process by serving its registered agent for service, CT Corporation System at 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136. At all times material Corizon, formerly known as Prison

Health Services, Inc. (PHS), had a contract with the County to provide reasonably necessary medical care to prisoners in the custody and control of the Sheriff, including those in the County's jails and under guard in outside medical facilities. For prisoners under guard it was responsible for making reasonable effort to ensure continuity of patient care. In regard to prisoners' health problems Corizon was responsible for scheduling, delivering, and/or coordinating all follow-up services including, but not limited to, inpatient hospitalization, specialty consultations, prescriptions, administration of appropriate medications, and ongoing monitoring of prisoner/patient's health status. Corizon staffed and operated a medical clinic in the Downtown Jail to provide medical care to prisoners in the facility. Additionally, Corizon worked with jail personnel to minimize the cost to the County of providing inpatient hospitalization of prisoners.

8.      Defendant Alex Salazar, M.D. is an individual residing in El Paso County, Texas who may be served at his places of business, Emergence Health Network, 9555 Diana Dr., El Paso, Texas, and Emergence Health Network, 2400 Trawood Dr., Ste. 301, El Paso, Texas, or wherever he may be found. On information and belief Dr. Salazar served Corizon as the on-site Medical Director and physician for the medical clinic in the Downtown Jail. Also on information and belief he was responsible for overseeing all the medical care and treatment provided to prisoners by the medical staff, making and enforcing policies and procedures, and providing training related to the medical care of prisoners. He oversaw the care provided in the intake/receiving screening process, the health assessments, the care provided in the medical clinic, the provision of diagnostic services in the clinic, the referral of prisoners to outside medical providers, and the provision of follow-up services identified as needed at intake/screenings, health evaluations, sick calls, and by outside medical providers. On behalf of Corizon Dr. Salazar worked with jail personnel to minimize the cost to the County of providing inpatient hospitalization of prisoners.

## V.  Statement of Facts

9.     The allegations in paragraphs 1 through 8 of this Complaint are incorporated by reference into this paragraph.

10.     On the night of June 18, 2014 Mrs. April Cadena was a pedestrian crossing a street when she was struck by a motor vehicle. The tibia and fibula bones of her right leg were severely fractured. She was immediately taken to the Providence Memorial Hospital emergency room where the leg bones were realigned and a splint was applied to temporarily immobilize the leg. On June 20 a surgeon implanted an intramedullary rod (IM nail) inside the length of her tibia to fix and stabilize the bones. Mrs. Cadena was discharged from the hospital on June 22, 2014. She was unable to use crutches. On discharge she was wearing a removable fracture boot that extended above her knee, and was given a wheelchair, a walker, a prescription for pain medicine, and instructions to rest, elevate her leg, and take the pain medicine as needed until her follow-up doctor's appointment.

11.     On June 23, 2014, Mrs. Cadena was arrested by El Paso police officers on a bench warrant for an alleged violation of her probation. At about 9:16 p.m. she was booked into the Downtown Jail. Mrs. Cadena entered the jail in her wheelchair, wearing the fracture boot, and in possession of her prescribed pain medicine.

12.     At all times material the detention officers referenced herein were employees of the County and Sheriff working in the course and scope of their employment and under color of State law.

13.     At all times material Dr. Alex Salazar and the jail nurses referenced herein were employees of Corizon working in the course and scope of their employment and under color of State law.

14.     The Downtown Jail was constructed and opened in 1983 before the enactment of the

Americans with Disabilities Act (ADA). At all times material the cells for prisoners in Cellblock 1130 did not meet the ADA's specifications for accessibility of prisoners with mobility disabilities. Because the jail does not meet the specifications, the County needs to make reasonable modifications in policies, practices, and procedures to ensure prisoners with mobility disabilities live in safe conditions and are not discriminated against and excluded from participation in or denied the benefits of services, programs, or activities provided.

15.     The County's contract with Corizon provided for an intake/receiving screening processing of prisoners using unsupervised licensed vocational nurses (LVN's) to perform an assessment of prisoners entering the jail including a triage and comprehensive assessment of their health. The intake nurse's duties included inquiring into prisoners' current illnesses, health problems, medications taken, and special health requirements, and identifying their emergent and urgent medical, dental, and mental healthcare needs. The intake nurse identified prisoners' mobility restrictions and disabilities that warranted special accessibility or other consideration. The intake nurse documented the information obtained from their interview of the prisoner for medical and mental health history, their observation and examination of the prisoner, and their taking of the prisoner's vital signs. The intake nurse then decided whether the prisoner needed to be referred for special housing, emergent and emergency health services, or additional medical specialties, and documented the need for the referral and any specific medical care needed.

16.     The intake process used detention officers to interview each prisoner for suicide assessment and assignment of a security classification status. An officer then assigned the prisoner to a cell based on the intake nurse's recommendations and the information obtained by the officers.

17.     During the intake of Mrs. Cadena, Jail Nurse Stephanie Portillo, LVN, and Detention Officer Rosalia Estrada asked why she was in a wheelchair and why her leg was in the removable

cast/boot. Mrs. Cadena explained she had surgery two days earlier for her broken leg, and that when she was discharged from the hospital she was given the wheelchair and a walker to use during her recovery and a prescription for the pain medicine she had brought to the jail.

18.     Officer Estrada ordered Mrs. Cadena to remove the fracture boot from her leg. Mrs. Cadena complied with the order and removed it. Officer Estrada then asked Nurse Portillo if Mrs. Cadena was going to be incarcerated with the bandages on her leg. Nurse Portillo answered "no," and Officer Estrada ordered Mrs. Cadena to remove them. Mrs. Cadena informed Officer Estrada that she had been instructed to not remove the bandages and to return in ten days to have them removed during a follow-up appointment. Nurse Portillo and Officer Estrada ordered Mrs. Cadena to remove the bandages so they could see the wound. Mrs. Cadena complied and removed the elastic bandage revealing the sterile dressing. Nurse Portillo then removed the sterile dressing, and in the process she pulled at some of the wound closures and the wound started bleeding. Nurse Portillo saw the surgical wounds and said the jail's doctor would redress them when she went to the clinic.

19.     Nurse Portillo's entries in the Intake Receiving and Screening form include checkmarks in the Critical Observation section for her assessments there was no indication for an urgent/emergent medical referral and that no urgent/emergent security and mental health referrals should be made. The section includes a checkmark to indicate her assessment Mrs. Cadena had no mobility restrictions, and another checkmark and a notation that she was using a wheelchair as a physical aid after having right leg surgery. In the History section there are checkmarks documenting Mrs. Cadena's report of recent major surgery and hospitalization and notes explaining they were for right leg surgery. This section also includes documentation of Mrs. Cadena's report she was taking Hydrocodone/Acetaminophen as needed after her right leg surgery, and that her last dose was six hours earlier. In the Disposition section Nurse Portillo used checkmarks to indicate her assessments

that Mrs. Cadena be placed in the general population (GP) and for her History and Physical (H&P) to be taken routinely. In the Additional Comments section Nurse Portillo incorrectly noted, "Pt. stated she had knee surgery yesterday." She further noted, "Pt. has a visible ~~wound~~ incision to Ⓡ knee and 3 inches long. No drainage or bleeding noted. Slight swelling below the knee to Ⓡ ankle. Cap refill within 3 secs. Pedal pulses palpable in Ⓡ foot. AAOX3. Pt in wheelchair, able to stand independently. Pt has a prescription for hydrocodone. Pain level 10/10. Will call doctor for orders."

20.    Detention Officer Francisco Ortiz interviewed Mrs. Cadena for classification. In a notation regarding her health, he stated there were "no problems which limit housing or work assignments." He did this notwithstanding Mrs. Cadena was still in her wheelchair. He nevertheless noted she was to be placed in Cellblock 1130 instead of the jail's general population.

21.    On June 23, 2014 Nurse Portillo talked to Dr. Alex Salazar, and he ordered Norco pain medicine for Mrs. Cadena, a follow-up appointment with orthopedic in two weeks, and crutches and a lower bunk to be given to her until cleared. He also ordered wound care for her right leg. Nurses started administering pain medicine to Mrs. Cadena late in the evening of June 24, 2014, and they began cleaning her surgical wounds on June 26, 2014.

22.    After completing the intake processing Mrs. Cadena was not taken to the jail's medical clinic, her surgical wounds were not redressed, and she was not given a placement in the general population. Instead, detention officers placed her in a holding cell pending transfer to Cellblock 1130 for Administrative Separation.

23.    The County's policy and procedure for placing prisoners in Administrative Separation is in Chapter 3.09 of its Detention Services Policy and Procedure Manual. The policy is to segregate prisoners who present a serious threat to the safety and security of the facility, staff, general prisoner population, or themselves by placing them in single occupant cells commonly referred to as

lockdown cells. Prisoners housed in these cells are locked inside their quarters to prevent them from having contact with other prisoners. The policy states, "At no time will two inmates be out in the housing area at the same time." The County's policies also provide for administrative separation to protect the prisoner put in the cell. Additionally, the County's policies, procedures, practices, or customs use administrative separation to house prisoners with special medical needs. Upon information and belief Cellblock 1130 was used by the County for special medical needs prisoners.

24.     In or about the early morning of June 24, 2014 two detention officers took Mrs. Cadena in her wheelchair to a cell in Cellblock 1130. The cell is a small single occupant lockdown cell with almost no room to maneuver in a wheelchair. In the presence of Mrs. Cadena, and while referring to her, one officer told the other there was no place in the jail for a prisoner in a wheelchair.

25.     In or about the afternoon of June 24, 2014 Detention Officer Margie Lopez, Detention Officer Monica Davila, and Nurse Portillo went to see Mrs. Cadena. The officers took away her wheelchair, gave her two crutches, and ordered her to go with them to the jail medical clinic. Mrs. Cadena told them she did not have the strength to use crutches, and that she needed the wheelchair or a walker. She informed them Providence Hospital gave her the wheelchair and a walker that she did not have in her possession when she was arrested. She asked for the wheelchair. The officers and the nurse left the cell taking the wheelchair with them and leaving Mrs. Cadena.

26.     A short while after leaving, Officer Davila returned with Detention Officer Pina to escort Mrs. Cadena to the jail's medical clinic. Mrs. Cadena told them she was unable to use the crutches. The officers insisted she use them, and would not give her the wheelchair. Mrs. Cadena tried using the crutches, but she was unable to use them. In the hallway going to the elevator, she was putting some weight on her broken leg and suffering pain and numbness in the leg before she fell. Luckily, Officer Pina caught Mrs. Cadena before she hit the floor. Officer Davila then obtained a

wheelchair that was used to take her to the clinic.

27.     The jail's doctor was not in the clinic. A nurse asked Mrs. Cadena about her leg and the bandages. In the presence of the detention officers, Mrs. Cadena explained her leg was broken and that she had surgery on it. She complained about her wheelchair being taken away, and told the nurse the hospital had given her the wheelchair to use during her recovery and that she needed it. She told the nurse she was in severe pain and had almost fallen on the way to the clinic. Mrs. Cadena informed the nurse she had been on Morphine at the hospital, and that she had prescription pain medicine in her belongings. The nurse responded telling Mrs. Cadena the doctor had to see her before prescription pain medicine could be given, and that she could not use the wheelchair and to instead use the crutches. The nurse did not redress the surgical wounds, and gave her only Ibuprofen for the pain.

28.     The detention officers returned Mrs. Cadena to her cell using the wheelchair. When they left the cell, they took the wheelchair with them and left Mrs. Cadena with only the crutches.

29.     The Jail's records document Mrs. Cadena was twice escorted out of her cell in Cellblock 1130 before she suffered her injury. On information and belief, both times were to take her to the jail medical clinic. The County and Corizon are both custodians of Mrs. Cadena's medical records.  The medical records for these visits to the clinic were not produced to Mrs. Cadena and her attorney before the filing of this lawsuit in response to their request for all her medical records.

30.     The County's policy, procedure, and custom for feeding prisoners in administrative separation are different from that used for the general population. The general population prisoners eat in the day rooms of their cellblock with their cell room doors closed, while prisoners in administrative separation eat in their cell rooms with the cell room doors closed. The policy is stated in the Housing and Guard Station Floor Control Officer Post Order, Chapter 8.10 of the Detention

Services Policy and Procedure Manual. The procedure and custom for feeding prisoners in administrative separation starts with a detention officer and two prisoner trusties moving a food cart into the hallway outside of the cellblock door. The first prisoner's cell is remotely opened by the officer. The prisoner walks to the cellblock door and retrieves the food tray that has been inserted by a trusty through an opening in the door. The prisoner returns with the food tray to her cell, and the officer remotely locks the cell door. The process is repeated for each prisoner in the cellblock. After all prisoners in the cellblock have eaten, the officer and trusties return to retrieve the food trays. Each prisoner slides the food tray under the cell room door into the day room. A prisoner whose turn it is to be in the day room collects the trays and hands them to a trusty through the cellblock door.

31.     In the afternoon of June 25, 2014, Mrs. Cadena had still not used the crutches to get a food tray to eat in her cell. Her cell was the furthest from the cellblock door. She skipped earlier meals because she was too tired and afraid of falling while using the crutches. Nobody had brought a food tray to her cell. At about 4:30 p.m., after the other prisoners in Cellblock 1130 had been given their food trays, Officer Davila opened the cell room door for Mrs. Cadena to get her food tray. Mrs. Cadena looked out of her cell and told Officer Davila she could not walk to the cellblock door. Officer Davila told Mrs. Cadena she had to try. Mrs. Cadena hadn't eaten all day and she was very hungry. She walked to the cellblock door putting some of her weight on the crutches and some on her broken leg. Mrs. Cadena asked Officer Davila if she could eat at the table in the day room so she would not have to walk carrying the tray back to her cell. Officer Davila answered telling Mrs. Cadena she could not eat there and to get her food tray and return to her cell.

32.     Mrs. Cadena got the food tray and returned to her cell walking on her broken leg carrying the food tray in her hands and the crutches in her armpits. When she arrived at her cell, the leg was numb and in severe pain, and she was having great difficulty just standing. Mrs. Cadena was

weak and had impaired balance because of the leg. Still carrying the food tray in her hands and the crutches in her armpits, she turned to put the tray on the table when she spilled her drink and slipped and fell on the floor, landing on her broken leg. When Mrs. Cadena fell, the hardware failed and she suffered severe injuries. The fractured ends of the tibia and fibula bones separated and her leg bones rotated causing misalignment, extreme pain and swelling, and severe injury. The injuries are to her leg, ankle, and foot, and include nerve damage. She screamed in pain. Ms. Rose Mary Pacheco, a prisoner in a nearby cell, called for help, yelling that Mrs. Cadena had fallen and was hurt.

33.     Officer Pina, Officer Davila, and other detention officers arrived. They asked Mrs. Cadena what happened, and repeatedly told her to get up. She responded saying she could not. Her leg and foot were extremely swollen, and her foot was dangling. She told them she could not walk, and feel and move her toes. An officer and Jail Nurse Charlie Fuentes, RN, brought a gurney to the cell, put Mrs. Cadena on it, and took her to the jail's medical clinic.

34.     In the clinic Nurse Fuentes tried to speak to Dr. Salazar by telephone to ask for authority on what to do with Mrs. Cadena who lay in bed complaining of severe pain and that she could not feel her toes. Nurse Fuentes examined Mrs. Cadena and took her vitals, but explained he could not give anything for her pain until Dr. Salazar gave him authority. Nurse Fuentes made telephone calls but he was unable to reach Dr. Salazar. Between telephone calls Nurse Fuentes paced back and forth, examined Mrs. Cadena's leg, and occasionally briefly left the room. Meanwhile Mrs. Cadena repeatedly asked Nurse Fuentes for help, and for him to send her to Providence Hospital where she had her surgery before she was arrested. After many examinations of the leg he said he was worried about the swelling and began telling the other nurses that Mrs. Cadena had to be taken to the hospital. However, he did not call for an emergency service transport or tell a detention officer to take her to a hospital. Nurse Fuentes continued trying to reach Dr. Salazar. Finally, Nurse Fuentes

spoke to someone on the telephone. In the conversation, he told the person he thought Mrs. Cadena should be sent to the hospital and was trying to convince the person she should be sent there. Then he told the person that Mrs. Cadena's blood pressure was very low. After that, he told Mrs. Cadena he was sending her to UMC Hospital.

35.     In his sick call notes, Nurse Fuentes, RN, reported Mrs. Cadena had fallen and he documented his examination of her. His entries include Mrs. Cadena had a pain level of 10+, a deformity distal from the knee, she was unable to move her toes and had only partial movement of her big toe, she was unable to feel a tactile stimulus to the outside aspect of her foot and palpation of the foot, and her vital signs. He wrote down numbers for her vital signs, including numbers for her blood pressure, and placed checkmarks to indicate urgent intervention was required due to the vital signs. He also reported Dr. Salazar was contacted at 7:30 p.m. and was notified Mrs. Cadena was being sent to the hospital for further evaluation.

36.     Finally, Nurse Fuentes prepared an Emergency Room Referral of Mrs. Cadena to University Medical Center (UMC), the County-owned hospital. He documented his reason for making the referral stating she had pain at a level of 10, she had slipped and fallen, she had a deformity distal from the knee, she was unable to feel tactile stimuli on the lateral aspect of her foot, and she had a history of surgery at Providence Hospital but did not know what type of surgery. He additionally reported her vital signs, reported a dose of Norco pain medicine was administered at 7:30 p.m., and reported she was allergic to penicillin. Nowhere in the referral did he state the reason for making it was because of low blood pressure. After preparing the referral someone helped Mrs. Cadena into a wheelchair, and Detention Officer Gloria Gallardo took her to the hospital.

37.     While Corizon has written policies for providing emergency medical services and for referring prisoners to hospital and specialty care, the written policies do not define what an

emergency is and what health conditions are required for referrals to hospitals and specialty care, and instead leave it to the company's Regional Medical Director and Dr. Salazar, the physician and site medical director, to decide. Corizon's policies, procedures, and customs do require consideration of minimizing the financial costs to the county of providing prisoners with medical care. On information and belief, these policies, procedures, and customs are followed to the point where medical care for obvious serious medical needs is delayed and/or denied.

38. On information and belief, Corizon's unwritten policy is to authorize referral of prisoners for emergency care only when their vital signs are not within normal limits. On information and belief, Nurse Fuentes' documentation in the sick call notes of Mrs. Cadena's vital signs being the reason for referring her to the hospital was only a pretext for sending her there, and his real reason for making the referral was Mrs. Cadena's obvious need of orthopedic medical care for a broken leg that had nerve damage as described in the Emergency Room Referral. At some point Nurse Fuentes wrote over the blood pressure numbers that he initially wrote in the sick call note and added the notation "WNL" next to the checkmark that vital signs was the reason for urgent intervention to indicate the vital signs were within normal limits. The blood pressures Nurse Fuentes recorded in the referral are the same as the final numbers in his sick call notes that is described as within normal limits.

39. Officer Gallardo gave a hospital emergency room employee Nurse Fuentes' referral and Mrs. Cadena's medical records from the jail. Mrs. Cadena told the emergency room doctor about her surgery at Providence Hospital, the date of the surgery, and when she had fallen at the jail. X-rays were taken of her leg. The doctor showed Mrs. Cadena and Officer Gallardo the x-rays, and explained and showed what happened to the hardware and how the bones moved and were no longer properly aligned and united. In the presence of Officer Gallardo, the doctor used a pin to prick the

skin of Mrs. Cadena's toes and shin and asked if she could feel the pin pricks. Mrs. Cadena answered saying, no.

40.     The emergency room doctor told Mrs. Cadena and Officer Gallardo surgery was needed. Mrs. Cadena expressed a desire for the surgeon who performed her surgery at Providence Hospital to perform the new surgery. The doctor said it was a good idea, to have the same surgeon perform the surgery. The doctor asked Officer Gallardo, "Do you want me to send her to Providence Hospital, or will you take her there?" Officer Gallardo responded saying she would take Mrs. Cadena to the hospital. The doctor was visibly upset with how long it took for Mrs. Cadena to be taken to the hospital. It was apparent he did not trust detention officers. Before Officer Gallardo left with Mrs. Cadena, the doctor took photographs of the injury and took down Officer Gallardo's name and badge number. UMC discharged Mrs. Cadena from its emergency room on June 26, 2014 at about 1:00 a.m. UMC returned the medical records to Officer Gallardo, and gave her its discharge instructions for Mrs. Cadena and a memo from a Texas Tech doctor.

41.     In the sheriff's vehicle, Mrs. Cadena asked Officer Gallardo if she was going to take her to Providence Hospital. Officer Gallardo responded "Right Now." However, Officer Gallardo did not take Mrs. Cadena to the hospital. Instead, she returned Mrs. Cadena to the jail. As Officer Gallardo was helping her out of the vehicle, Mrs. Cadena asked again if she was going to be taken to Providence Hospital. Officer Gallardo heard Mrs. Cadena, looked at her, and refused to answer the question. Later, in response to Ms. Cadena's grievance, while untruthfully denying knowledge of the referral to Providence Hospital, Officer Gallardo stated she had no authority to transport Mrs. Cadena there. Officer Gallardo did take Mrs. Cadena to the jail's medical clinic and gave the medical records, the UMC Hospital discharge instructions, and the Texas Tech doctors' memo to a jail nurse.

42.     The UMC discharge instructions and the Texas Tech doctor's memo explain Mrs.

Cadena's x-rays show a malaligned posterior tibia fracture with an IM nail and a proximal fibula fracture, and state she should be non-weight bearing on the right and follow up with her surgeon in the morning.

43.     The jail medical records show Mrs. Cadena was seen in the medical clinic on June 26, 2014 at 2:10 a.m. In a sick call report, Nurse Carranza, LVN, recorded Mrs. Cadena was back from the hospital with a tibia fracture and suffering nausea, severe thirst, and a headache from morphine, and was in pain at a level of 7 out of 10. Mrs. Cadena explained to Nurse Carranza that Officer Gallardo was supposed to take her to Providence Hospital for surgery. Instead of sending Mrs. Cadena to a hospital for surgery, Nurse Carranza had Mrs. Cadena sent in the wheelchair to her lockdown cell in Cellblock 1130.

44.     On information and belief, Dr. Salazar reviewed or was informed of the UMC discharge instructions and the memo from the Texas Tech doctor and gave an order that would have her ready for surgery. On June 26, 2014 at 6:00 a.m. Dr. Salazar issued an order for no medications to be given to Mrs. Cadena and to follow up with a surgeon that day.

45.     On information and belief the County and Corizon have a policy, procedure, and custom of scheduling prisoners for medical services primarily at UMC, the County-owned hospital, and with Texas Tech Physicians, the doctors providing medical care at UMC.

46.     The progress notes in Mrs. Cadena's medical records show on June 26, 2014 an employee whose initials are "M.V." called Texas Tech Orthopedics to ask about the appointment it was believed Mrs. Cadena had that day to see a surgeon and discovered there was no appointment. The employee asked for one, and she was told July 14, 2014 was the earliest available. The employee informed Dr. Salazar there was no appointment scheduled and the earliest available was July 14, 2014. Despite the instructions to follow up with Mrs. Cadena's surgeon in the morning, the jail

medical clinic records show Dr. Salazar approved waiting until July 14, 2014 to follow up with the Texas Tech surgeon. The employee who scheduled the appointment recorded, "Dr. Salazar approved appointment date for 7/14/12 @ 7:30 am being as that is the soonest available."

47.     On June 26, 2014, after the morphine wore off, and in the days that followed, Mrs. Cadena complained to detention officers about her severe pain and that Officer Gallardo was supposed to have taken her to the Providence Hospital emergency room for surgery. She explained the UMC emergency room doctor referred her there. The officers responded saying it was up to the jail's medical clinic personnel.

48.     Despite the County having a legal duty to provide reasonably necessary medical care to prisoners, the Health Services policy, Chapter 4.01 of its Detention Services Policy and Procedure Manual states, "Medical, dental, and mental health matters involving medical judgment are the <u>sole</u> province of the responsible physician and dentist, respectively." (Emphasis added) This policy allows detention officers to shirk the duty to safely keep all prisoners committed in the jail and creates a custom and practice of disregarding prisoners' rights to receive adequate medical care by legitimizing acquiesce of deliberate indifference to the obvious serious medical needs of prisoners.

49.     On information and belief, on or about June 26, 2014 Corporal Karin Gunsenhouser, a detention officer, saw Mrs. Cadena had an obvious serious medical need and took her to the jail's medical clinic. Cpl. Gunsenhouser saw Mrs. Cadena was going to shower. She helped Mrs. Cadena to sit down on a bucket and take off her pants. She saw Mrs. Cadena's leg, and Mrs. Cadena told her the leg was broken. She waited nearby and then helped Mrs. Cadena to get up and get dressed. Cpl. Gunsenhouser took Mrs. Cadena to the jail's medical clinic and asked a nurse if she should be placed in the medical ward. Mrs. Cadena told the nurses she had a broken leg and was in pain, that the UMC emergency room doctor had referred her to Providence Hospital for surgery, and that Officer

Gallardo was supposed to have taken her there. The nurses responded saying they needed to talk to Dr. Salazar. Cpl. Gunsenhouser then returned Mrs. Cadena to her lockdown cell.

50.     On or about June 27, 2014, Dr. Salazar recommended Mrs. Cadena be moved into a cell in 10 Ward, the medical ward near the jail's medical clinic. Detention officers moved Mrs. Cadena into 10 Ward. While in the medical ward, Mrs. Cadena repeatedly continued to complain of the pain in her right leg and about not being taken to Providence Hospital for the surgery.

51.     Beginning on June 27, 2014, jail nurses began treating the surgical wounds from Mrs. Cadena's surgery at Providence Hospital. Medical records show the surgical wounds were cleaned at UMC Hospital on June 26, and that several jail nurses, including registered nurses, cleaned the wounds on June 27, 28, 29, and on July 1, 4, 7, 9, 11, 12, and 15. During cleaning of the wounds, the deformity of the leg was obvious, and it was also obvious the leg needed more medical treatment than just cleaning. It was obvious the leg was broken and the bones needed proper alignment, fixation, and immobilization. Mrs. Cadena's recorded pain levels during the wound care ranged from 10 out of 10 on June 27, 2014 to 4 out of 10 on July 15, 2014.

52.     About one week after she was moved into the medical ward, Mrs. Cadena saw Dr. Salazar and for the first time she was able to talk to him. Mrs. Cadena told Dr. Salazar she had been taken to UMC Hospital and that the emergency room doctor referred her to Providence Hospital. She told him Officer Gallardo was supposed to have taken her there for the surgery. Dr. Salazar responded only saying, "I have the records. Have a nice day." He did nothing to treat the broken leg.

53.     Upon information and belief the County and Corizon have a policy or custom of not allowing prisoners to choose where they can receive medical care, and a policy or custom of not informing or a failure to have a policy or custom of informing, prisoners that they must accept the medical care offered or waive receiving any medical care at all. At no time did any employee or

agent of the County or Corizon ever tell Mrs. Cadena that she could not have the surgery if she did not agree to have it performed at UMC by a Texas Tech doctor. Furthermore, Mrs. Cadena never refused to have the surgery.

54.     On June 27, 2014 at 7:25 a.m. Dr. Salazar ordered a more frequent administration of the pain medicine. After giving the order, guards and nurses sometimes failed to administer the medicine and sometimes administered it very late, and Mrs. Cadena would be in severe pain.

55.     Mrs. Cadena was mostly bedridden after she returned from the UMC emergency room. On July 1, 2014 she developed a bedsore on the back of her right heel. Jail Nurse Eduardo Chavez, LVN, recorded Mrs. Cadena had a blister on her heel, a broken leg, numbness on the right side of her foot, and that she was reporting pain at a level of 10 out of 10. Dr. Salazar prescribed treatment for the pressure sore and an extra blanket to use to elevate the leg. However, despite knowing it was broken, Dr. Salazar did nothing to get it aligned, fixed, and further immobilized.

56.     Beginning on or about July 1, 2014 psychotropic drugs were administered to Mrs. Cadena. On information and belief the jail's medical records show a jail nurse prepared a referral of Mrs. Cadena to a mental healthcare specialist by filling out a Health Services Request Form on June 25 stating she had a lot of anxiety and was medicated outside of the jail. The request is not in Mrs. Cadena's handwriting, and she was not being medicated outside the jail. The request form appears to be signed "April Cadena," however the signature is not hers and she did not sign it. On information and belief the mental healthcare specialist who saw Mrs. Cadena is a jail nurse, a registered nurse practitioner with psychiatric/mental health prescriptive authority. This person prepared an Initial Evaluation dated July 1, 2014 falsely stating Mrs. Cadena's chief complaint was "Yes mam" and that Mrs. Cadena had a history of depression and was obtaining help at UBH. She further reported Mrs. Cadena was not sleeping, had anxiety, and was feeling depressed and had low

energy. The alleged signed consent for use of psychotropic drugs is dated July 2, 2014. The person prescribed Celexa and Vistaril and ordered their administration.

57.     On information and belief the pyschotropic drugs were administered to Mrs. Cadena in combination with each other and the Norco pain medicine for the purpose of sedating her. On information and belief, Corizon over prescribes psychotropic drugs to prisoners and has a policy, procedure, or custom of using the drugs to control prisoners' behavior. Mrs. Cadena was given these drugs until she was released from the jail on July 18, 2014. During much of the time the psychotropic drugs were administered Mrs. Cadena was very sleepy and weak. However, sometimes guards and nurses were late in administering the drugs and at times failed to administer a dose and Mrs. Cadena would be in severe pain. On information and belief records were kept for the administration of all medicine to Mrs. Cadena, however the records for administration of medicine in July 2014 were not produced to Mrs. Cadena and her attorney before the filing of this lawsuit in response to their request for all her medical records.

58.     On July 3, 2014 a detention officer took Mrs. Cadena in a wheelchair to the 34TH District Court. Because of the effects of the psychotropic drugs and pain medicine she was being given, Mrs. Cadena was unable to understand and answer Judge William E. Moody's questions. Judge Moody signed an order releasing Mrs. Cadena to WSAT, the El Paso County Women's Substance Abuse Treatment Facility. At the time, the bench warrant and the order for release to WSAT were the only detainers holding her in the jail. On information and belief, after Judge Moody signed the order Mrs. Cadena remained in jail waiting only for an opening in WSAT.

59.     While Mrs. Cadena was mostly bedridden, she did have to move her leg. When she did, she suffered severe pain. Mrs. Cadena tried laying flat on the bed, positioning her leg in a neutral position to prevent pain, but at times she had to shift her weight and move her leg. She had to get

out of bed to use the toilet, to take an occasional shower, to go to court on July 3rd, and later, to go to another court setting, a doctor's appointment, and to be processed and released from jail to go to WSAT. It was especially painful when she got in and out of bed, and transferred to and from the wheelchair, the commode, the car seat of the sheriff's vehicle, and the chair in the medical clinic's shower. Mrs. Cadena asked guards and nurses for a cane or walker to use to help when transferring, but they did not give her anything. The medicines made her dizzy, and there were times when she had to steady herself to keep from falling by putting weight on her broken leg. When that happened, she was in extreme pain. One time her leg became so swollen that a nurse had to cut off the leg of her cotton jail uniform to keep it from restricting the blood circulation in the leg.

60. The County and Corizon have a policy, procedure, or custom of not informing prisoners of the dates of their doctor's appointments until just prior to the appointment. On information and belief this policy, procedure, and custom is for security reasons. Mrs. Cadena was never told in advance when she would be taken for medical care.

61. On or about July 14, 2014, Mrs. Cadena discovered she had an appointment with a surgeon. A detention officer drove Mrs. Cadena to the Texas Tech Orthopedic Clinic. X-rays were taken. The leg was not healing properly. The bones were out of alignment and without proper union. Upon the Texas Tech orthopedic surgeon's learning Mrs. Cadena had not been taken to Providence Hospital for the surgery, he became very upset and loudly and angrily said something like, "Why has it taken so long!" and "Why wasn't she taken there!" and, "If the surgery is not going to be done there, we will do it here!" When the doctor examined her, he told Mrs. Cadena while looking at the detention officer who had brought her to see him, something like, "You are lucky that you have not lost the leg!" Mrs. Cadena's leg continued to have an obvious deformity - it was malaligned with her foot dangling and one part of the leg angled to the left and the other part angled to the right. And,

she still had no feeling in part of her foot and shin and some of her toes.

62.     At all times after Mrs. Cadena fell on June 25, 2014, it was obvious even to a lay person that her leg was broken. It was obvious to a lay person the leg bones needed to be aligned and fixed, the leg needed to be further immobilized, and surgery was needed. A simple look at the leg's deformity could tell a lay person as much. Likewise, even a lay person could observe Mrs. Cadena was bedridden and in great pain whenever she moved and understand her inability to move and feel her toes was a serious medical condition requiring immediate orthopedic care. Furthermore, even a lay person would know surgery was needed when implanted hardware has failed to secure the bones it was intended to secure. It was obvious the leg needed medical care to heal properly.

63.     Between June 25, 2014 and Mrs. Cadena's release from jail on July 18, 2015 the jail doctor and numerous jail nurses reviewed the UMC discharge instructions, the Texas Tech doctor's memo, and Corizon's records that document the leg was fractured and malaligned. Many nurses saw the leg and its deformity while cleaning the surgical wounds. Mrs. Cadena told many nurses and the doctor that her leg was broken, and they heard her say she was supposed to have been taken to Providence Hospital for surgery. They knew the leg was broken and that there was a malalignment and failure of proper union of the bones. They knew the leg was not healing properly. They knew the leg was not being properly treated because the bones had not been aligned, fixed, and further immobilized. On information and belief the jail doctor, RN nurses, and  LVN nurses who saw Mrs. Cadena knew she was not being adequately treated for her serious medical needs.

64.     On information and belief, between June 25, 2014 and July 18, 2015 numerous detention officers knew Mrs. Cadena was not being given adequate medical care for her broken leg. These officers included those who arrived after the fall who saw that she could not stand and walk and knew she had to be taken on a gurney to the medical clinic, those present in the clinic when she

told Nurse Fuentes she could not feel the pin pricks on her leg and when Nurse Fuentes said she needed to be taken to the hospital, Officer Gallardo who was present with her when the UMC emergency room doctor said she needed surgery, Cpl. Gunsenhouser who questioned whether she should be in the lockdown cellblock, the numerous officers whom she complained to on the 10th and 11th floor, the officers who saw Mrs. Cadena bedridden for weeks in the medical ward, the transfer officers who took Mrs. Cadena to her Court settings and her outside doctors' appointments and saw she was in pain especially when transferring in and out of the wheelchair, the officers who knew about her pre-op appointment and surgery, and Downtown Jail Commander Marco Vargas who knew she needed surgery and approved it being scheduled for July 18th and then postponed or approved or ratified postponement of the surgery until July 22, 2014.

65.     On July 14, 2014 a handwritten summary report of the Texas Tech surgeon's findings and recommendations was given to the detention officer who delivered it to the jail medical clinic. The summary and a detailed report that was faxed later in the day that includes an estimate of the costs for surgery are in the Mrs. Cadena's jail medical clinic records. The reports explain the hardware that had fixed the broken tibia had failed, surgery was needed to repair the leg, and that surgery was scheduled for July 18, 2014 pending authorization by the County.

66.     On July 16, 2014 Downtown Jail Commander Vargas approved the surgery. The time for the surgery at UMC would not be given to the County until after the pre-op appointment. That same day a pre-op appointment was scheduled for July 17, 2014 at 2:00 p.m. However on July 16 or 17, 2014 the County and Corizon cancelled the pre-op appointment and surgery and rescheduled them for July 21 and 22, 2014. Upon information and belief, Commander Vargas and Dr. Salazar, policy makers and enforcers for the respective defendants, made the decisions to delay and deny Mrs. Cadena the surgery or ratified them. A notation in the progress notes of the medical records show

the rescheduling was allegedly so Mrs. Cadena could attend a conference scheduled by a court.

67.     On information and belief the surgery Mrs. Cadena needed was postponed until after she was released from the Sheriff's custody so the County would not have to pay for it. On July 7, 2014, Mrs. Cadena's personal recognizance bond for her misdemeanor cases was revoked and she began to be detained in jail for the charges. On July 18, 2014 a detention officer took Mrs. Cadena to County Criminal Court Number 4 for a judge's conference. On information and belief the Court did not order the Sheriff to present Mrs. Cadena to the Court, and if it did, the Sheriff could have informed the Court of Mrs. Cadena's need for medical care and the Court would surely have postponed the judge's conference. At the judge's conference, Mrs. Cadena's misdemeanor cases, all of which were in the pretrial stage, were disposed of with dismissals and pleas for time served. On the same day Mrs. Cadena was released to WSAT to continue her felony probation.

68.     At WSAT Nurse Daphne Jones, RN, an employee of the UMC onsite clinic, informed Mrs. Cadena the Sheriff did not want to pay for surgery on the leg and that she would have to make her own financial arrangements. Nurse Jones told Mrs. Cadena she would help her to get a discount from UMC and Texas Tech physicians, and then a social worker helped her get the discounts.

69.     On July 21, 2014 Mrs. Cadena was taken to the pre-op appointment, and on July 22, 2014 the Texas Tech orthopedic surgeon performed the surgery at UMC and repaired the broken and incorrectly healing leg. The surgeon revised the Providence Hospital surgeon's work on the broken leg using the existing intramedullary rod. In the course of the surgery the tibia was put in traction to correct some of the deformity, and an incision was made over the tibia fracture to allow the use of forceps to correct some of the remaining deformity. Three screws were used to hold everything in place. Incisions were required for the new screws.

70.     The County has a written policy and procedure to provide prisoners with handbooks

that include a grievance procedure. However, on information and belief, the County has a custom or practice of not always giving prisoners handbooks, of jail officers not telling prisoners of the grievance procedure when they orally complain to them, of not informing disabled and special needs prisoners of their right to make grievances, and generally of creating obstacles for the presentation of grievances to prevent them being submitted. Mrs. Cadena was not given a handbook, and after making oral complaints, no jail officer or Corizon employee ever explained the grievance procedure to her. Mrs. Cadena did not know what she needed to do to make a grievance. When she returned to the jail in September 2014, Mrs. Cadena attempted to submit a grievance. In the jail library on the wall by the telephone was a posting allegedly of the telephone number to call for making complaints about jail conditions to the Office of the Inspector General for the U.S. Department of Justice. Unknown to Mrs. Cadena the telephone number was really for a phone sex line, and when she dialed the number the call would not go through. Also next to the telephone was a posting of the address for the Inspector General. On or about September 23, 2014, Mrs. Cadena handed the detention officer who collects prisoners' outgoing mail a stamped envelope addressed to the Inspector General. The letter was a grievance complaining of the failure to accommodate her disability, the discrimination against her because of her disability, and the deliberate indifference to her serious medical needs. On information and belief the County never sent the letter. On information and belief, had the letter been sent to the inspector general, it would have been logged in as having been received and then forwarded to the County.

71.     On October 30, 2014, still not knowing of any grievance procedure, Mrs. Cadena submitted a grievance to the County complaining of the deliberate indifference to her serious medical needs. On November 20, 2014 she submitted another grievance to complain of the posting of the Inspector General's alleged telephone number, the failure of the County to mail the letter, and the

failure of the County to post its grievance procedure in the library. The Defendants never responded to her grievances.

72.     As a proximate result of all of the Defendants' conduct Mrs. Cadena has suffered severe pain and bodily injury to her right leg and her body as a whole. Mrs. Cadena's right leg is now shorter than her left. It is also much weaker and has nerve damage. She has no feeling in her shin, and she cannot flex her foot upwards nor feel and move her two small toes. The lower leg is constantly swollen and noticeably wider than her other leg. She walks with pain in her lower right leg. Because her right leg is shorter than her left, walking also causes pain in her right hip from the transference of impact force up the leg. Mrs. Cadena's right leg tires easily and she can only walk short distances. She cannot walk for long periods or any great distance. The leg also has three large zipper scars from the surgery performed by the Texas Tech surgeon to revise the earlier work on the broken leg. The injuries have had a serious effect on her well being. Some of these ill effects are permanent and will abide with her for a long time in the future, if not for her entire life.

73.     As a further proximate result of Defendants' conduct and the nature and consequences of her injuries, Mrs. Cadena has suffered and will in the future continue to suffer physical pain and suffering, mental anguish, severe emotional distress, physical impairment, disfigurement, loss of enjoyment of life, loss of earnings, and loss of earning capacity.

74.     As a further proximate result of Defendants' conduct and the nature and consequences of her injuries, Mrs. Cadena has incurred medical expenses. These expenses were incurred for necessary care and treatment of her injuries resulting from conduct of the Defendants. The charges are reasonable and were the usual and customary charges made for such services in El Paso County, Texas.

75.     As a further proximate result of Defendants' conduct and the nature and consequences

of her injuries, there is a reasonable probability Mrs. Cadena will require further medical care and attention and will incur future reasonable and necessary medical expenses.

76.　　As a further proximate result of Defendants' conduct, Mrs. Cadena has been compelled to hire an attorney and pay the attorney for legal services rendered and to be rendered in the preparation and trial of this case.

## VI.　Causes of Action

**A.　Count 1:　Violations of Title II of the Americans with Disabilities Act and the Rehabilitation Act by Defendant El Paso County**

77.　　Plaintiff April Cadena re-alleges paragraphs 1-76.

78.　　Count One is a claim for Defendant El Paso County's refusal to accommodate Mrs. Cadena's disability and for its discrimination against her in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. Section §12131 et seq. ("ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Rehabilitation Act").

79.　　Title II of the ADA and the Rehabilitation Act prohibit discrimination against disabled persons. Title II of the ADA states:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. Section §12132.

The Rehabilitation Act states:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . 29 U.S.C. §794.

80.　　The ADA and the Rehabilitation Act both require reasonable accommodations to be made to assist disabled persons in accessing public programs and services, including reasonably modifying facilities, services, and programs to accomplish the purpose of the laws.

81.     Upon information and belief, El Paso County and its Downtown Detention Facility have received federal funds and are therefore subject to the requirements of the Rehabilitation Act.

82.     El Paso County and its Downtown Detention Facility are public entities within the meaning of Title II of the ADA and provide services, programs, and activities to the general public.

83.     Title II of the ADA has essentially the same mandate as the Rehabilitation Act.

84.     At all times material to this lawsuit, Mrs. Cadena was a qualified individual within the meaning of Title II of the ADA and met the essential eligibility requirements for the receipt of the services, programs, or activities of the Downtown Detention Facility. Specifically, Mrs. Cadena suffered from a physical impairment, a severely broken leg that substantially limited one or more major life activities, including walking, standing, lifting, bending, carrying, sleeping, and working.

85.     El Paso County provides prisoners with housing, showers, food, medical care, and library, indoor and outdoor recreation time, and educational, religious, and work programs, which comprise programs and services for Title II of the ADA and Rehabilitation Act purposes.

86.     Under the ADA and the Rehabilitation Act, El Paso County is required to accommodate disabled prisoners, including providing necessary mobility aids including wheelchairs and walkers, to provide the same level of medical care to disabled prisoners as the general jail population, and to allow and enable disabled prisoners to participate in and receive the benefit of the same programs and services as prisoners who are not disabled.

87.     El Paso County was deliberately indifferent in failing to provide Mrs. Cadena with reasonable accommodations and other services related to her disability and denied her the rights and benefits accorded to other prisoners solely by reason of her disability, in violation of Title II of the ADA and the Rehabilitation Act in the following particulars:

a.     The County failed to provide Mrs. Cadena with her wheelchair even after she

explained she was unable to use crutches and asked for the wheelchair.

b.	The County required Mrs. Cadena to use crutches even after she explained she was unable to use crutches and asked for a wheelchair.

c.	The County segregated Mrs. Cadena from the general population and placed her in a lockdown cell knowing the policy for placement there required her to simultaneously carry crutches and a food tray to eat her meal in the cell.

d.	The County failed to provide Mrs. Cadena with a wheelchair accessible cell, a cell with wheelchair accessible features, during her incarceration in Cellblock 1130, thus severely restricting her mobility and the area in which she could move in comparison with prisoners who are not mobility disabled and in wheelchairs.

e.	The County failed to modify its food delivery procedure and required Mrs. Cadena to walk from her cell to the cellblock door to get her meal and to return carrying her crutches and the food tray rather than providing the food in a manner that would not require walking on both feet, even after Mrs. Cadena explained she could not walk.

f.	The County failed to modify its food delivery procedure and refused to allow Mrs. Cadena to eat at the table in the day room of Cellblock 1130 even after she asked to eat there, explained she could not walk, and when it was obvious she could not simultaneously use crutches and carry a food tray to her cell.

g.	Title II of the ADA and the Rehabilitation Act require that there be no interference with medical care and treatment of prisoners' disabilities. There was interference in the surgeons' treatment of Mrs. Cadena's broken leg and their instructions for her recovery. Specifically, El Paso County interfered in the following manner:

　　　1)	The County removed Mrs. Cadena's fracture boot and her surgical

wound dressings before the surgeon's requirement that they only be removed ten days after the surgery.

2)    The County took away the wheelchair the surgeon at Providence hospital had instructed Mrs. Cadena to use during her recovery.

3)    The County required Mrs. Cadena to use crutches despite the Providence hospital surgeon's instructions that she should use a wheelchair and a walker during her recovery for ten days until her follow-up appointment.

4)    The County failed to administer to Mrs. Cadena the pain medicines the Providence hospital surgeon and the UMC emergency room doctor prescribed.

5)    The County required Mrs. Cadena to walk before the Providence hospital surgeon allowed her, and for greater distances and periods of time than he allowed.

6)    The County did not take Mrs. Cadena for a follow-up appointment with her surgeon on June 26, 2014, as instructed in the UMC hospital discharge instructions and the emergency room physician's memo.

7)    The County did not take Mrs. Cadena for the follow-up appointment with Providence Hospital's surgeon as required.

h.    Title II of the ADA and the Rehabilitation Act require that physically disabled prisoners have access to adequate medical care. Mrs. Cadena was denied such care. Specifically, the County denied her adequate medical care in the following manner:

1)    The County failed to have Mrs. Cadena's surgical wounds redressed

after the original dressings were removed.

2)     The County failed to administer the pain medicine Mrs. Cadena's Providence hospital surgeon had prescribed when she was in pain before June 25, 2014 including when she was in severe pain after she was required to try to walk to the clinic before she fell on June 25.

3)     The County failed to administer and to timely administer the prescribed pain medicine to Mrs. Cadena on June 26, 2014 and part of the day on June 27, 2014, and at times during the period from July 1, 2014 to July 18, 2014 when she was in pain.

4)     The County failed to provide Mrs. Cadena with pain medicine for the short transition period immediately after she was released from jail, from July 18, 2014 to July 21, 2014, when she was still in pain.

5)     The County failed to provide Mrs. Cadena with medical care, including alignment and fixation of her broken bones, immobilization of her leg, and surgery to revise the failed hardware and repair the leg during the weeks she was in the jail.

i.     Title II of the ADA and the Rehabilitation Act require that physically disabled prisoners have access to El Paso County jail programs, services, activities, work and educational opportunities. Mrs. Cadena was unable to have access to and receive the benefits of such programs and services. Because she spent much of her time in the jail sedated and confined to her bed and a wheelchair, she was denied many programs, services, and activities available to prisoners, e.g., meals, showering, exercise, work, educational programs, and day room, outdoors, and library time.

88.     El Paso County failed to have and enforce appropriate policies and procedures to ensure provision of necessary accommodations for Mrs. Cadena's disability, to ensure modifications were made to existing programs and services so Mrs. Cadena could participate in them and receive their benefits, and/or to provide programs and services for prisoners with disabilities like hers.

89.     El Paso County failed to train and supervise jail staff to provide necessary accommodations, programs and services, and physical access to prisoners with mobility disabilities.

90.     As a direct and proximate result of the foregoing wrongful conduct, El Paso County failed to accommodate Mrs. Cadena's disability and discriminated against her on the basis of her disability in violation of Title II of the ADA and the Rehabilitation Act, causing her to not have access to and benefit from programs and services at the jail, to fall and suffer a failure of the hardware in her broken leg, severe physical pain, mental anguish, emotional distress, disfigurement, and to live the remainder of her life with a leg that is painful, weak, swollen, disfigured, shorter than her other leg, and with nerve damage and no feeling and movement of her shin and two small toes.

91.     Accordingly, Mrs. Cadena is entitled to economic damages in the amount of her medical bills, and non-economic damages in an amount to be determined at trial against Defendant El Paso County for violations of Title II of the Americans with Disabilities Act, 42 U.S.C. Section §12101 et seq., the Rehabilitation Act, 29 U.S.C. §794, and plaintiff's attorney fees and costs pursuant to 29 U.S.C. §794((b) and 42 U.S.C. §§12205 and 1988.

**B.     Count II:  Violations of Civil Rights by Defendant El Paso County**

92.     Plaintiff April Cadena re-alleges paragraphs' 1-90.

93.     Count Two is brought pursuant to 42 U.S.C. §1983 to redress Defendant County of El Paso's violations of the First, Eighth, and Fourteenth Amendments to the United States Constitution.

94.     Section 1983 provides remedies for violations of rights secured by the Constitution and laws of the United States. The law provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

95.     At all times material El Paso County's jail staff, its Jail Commander, detention officers, and employees, worked in the course and scope of their employment and under color of State law.

96.     The County was deliberately indifferent to the serious medical needs of Mrs. Cadena, thus subjecting her to cruel and unusual punishment in violation of the Eighth Amendment and her right to due process of law under the Fourteenth Amendment.

97.     The County subjected Mrs. Cadena to conditions of confinement that were cruel and unusual punishment in violation of the Eighth Amendment and her right to due process of law under the Fourteenth Amendment.

98.     On information and belief the County's policymakers knew LVN's were not qualified to perform the jail intake/receiving screening processing of prisoners, including the triage and assessment of their health, and that registered nurses (RN's) would have to perform the duties for adequate medical care to be given, but despite that knowledge they contracted with Corizon to have the services performed by LVN's and allowed assignment of LVN's to perform the duties, knowing it posed a substantial risk of harm to prisoners including Mrs. Cadena, and this deliberate indifference to their serious medical needs resulted in Mrs. Cadena being deprived of a wheelchair, being given crutches, and falling and suffering severe pain and injuries.

99.     The County's jail staff knew Mrs. Cadena was booked into the jail in a wheelchair

with a disabling injury, a severely broken leg, and prescription pain medicine in her possession, and that she was saying she could not walk with crutches and that her Providence Hospital doctor treated the injury with surgery and instructed her to use the wheelchair, a walker, and prescription medicine during her recovery, but despite that knowledge they:

    a.    Interfered and acquiesced in interfering with her doctor's treatment and instructions for her recovery and refused to accommodate her disability and discriminated against her because of it by denying her use of the wheelchair and instead required her to use crutches knowing it posed a substantial risk of harm to her, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her falling and suffering severe pain and injuries;

    b.    Denied and acquiesced in denying her the use of a wheelchair and refused to accommodate her disability and discriminated against her because of it by instead requiring her to use crutches knowing it posed a substantial risk of harm to her, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her falling and suffering severe pain and injuries.

100.    The County's jail staff knew Mrs. Cadena was placed in Cellblock 1130 in a wheelchair with a disabling leg injury, a severely broken leg, that after a decision was made to take away the wheelchair and give her crutches she could not use the crutches to walk, and that in this cellblock she would have to walk from her cell to the cellblock door and return carrying crutches and a food tray to eat in her cell, but despite that knowledge they continued her placement in Cellblock 1130 and refused to accommodate her disability and discriminated against her because of it, knowing it posed a substantial risk of serious harm to her, rather than placing her in another cellblock where she could eat in a day room and not have to walk carrying crutches and a food tray, and this

deliberate indifference to her serious medical needs and condition of confinement resulted in her falling and suffering severe pain and injuries.

101.     The County's jail staff knew Mrs. Cadena was in severe pain after she was required to walk to the medical clinic, they knew she was prescribed pain medicine and had it in her possession when she was booked into jail, and they knew the jail nurses refused to administer it, but they nevertheless acquiesced in Defendant Corizon's denial of treatment including the refusal to administer the medicine and denied her access to qualified healthcare personnel who would administer it and refused to accommodate her disability and discriminated against her because of it, knowing it posed a substantial risk of harm to her and despite the County having a legal duty to provide adequate medical care, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her suffering severe pain and injury.

102.     The County's jail staff knew Mrs. Cadena had a severe disabling injury and that she was being required to use crutches despite her complaint that she could not walk with them, but despite that knowledge, they required her to walk to the cellblock door to get a food tray, denied her request to eat in the day room, and required her to return to her cell carrying the crutches and food tray and refused to accommodate her disability and discriminated against her because of it, knowing it posed a serious risk of harm to her, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her falling and suffering severe pain and injuries.

103.     The County's jail staff knew Mrs. Cadena suffered a severe disabling injury in her fall in the jail, and that she was in severe pain and had been prescribed pain medicine, and they knew she was not being administered the medicine, but they nevertheless acquiesced in Defendant Corizon's  refusal to administer the medicine and denial of access to qualified healthcare personnel who would administer it and refused to accommodate her disability and discriminated against her

because of it, knowing it posed a substantial risk of harm to her and despite the County having a legal duty to provide adequate medical care, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her suffering severe pain and injury.

104.    The County's jail staff knew Mrs. Cadena's suffered a severe disabling injury from her fall in the jail and they knew she had a serious medical need for treatment of her leg, but they nevertheless denied her access to qualified healthcare personnel who would treat the leg and acquiesced in Defendant Corizon Health, Inc.'s denial of medical care and delay in sending her to the UMC emergency room and refused to accommodate her disability and discriminated against her because of it, knowing it posed a substantial risk of harm to her and despite the County having a legal duty to provide adequate medical care, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her suffering severe pain and injury.

105.    The County's jail staff knew Mrs. Cadena suffered a severe disabling injury from her fall in the jail and they knew she had a serious medical need for treatment of her leg, but after returning from UMC hospital they denied her access to qualified healthcare personnel who would treat her severely broken leg and  revise or replace the failed hardware and acquiesced in Defendant Corizon's denial of medical care and refused to accommodate her disability and discriminated against her because of it, knowing it posed a substantial risk of harm to her and despite the County having a legal duty to provide adequate medical care, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her suffering severe pain and injury.

106.    The above described wrongful conduct, the actions and inactions of Defendant El Paso County's jail staff, were the result of the following policies, procedures, customs, and practices of the County:

a.    Allowing unqualified Corizon staff, LVN's, to perform the intake/receiving screening

processing and assessing of the health of prisoners entering the jail.

b.      Failing to implement and enforce adequate policies and procedures regarding the needs of mobility disabled prisoners in the jail who use mobility aids.

c.      Failing to train the jail staff regarding the needs of mobility disabled prisoners who use mobility aids.

d.      Failure to train the jail staff to keep accurate records of mobility and special accessibility considerations for each prisoner booked into the jail.

e.      Failing to designate adequate cells for mobility disabled prisoners who use mobility aids, including wheelchairs and crutches.

f.      Using administrative separation lockdown cells for housing mobility disabled prisoners who use wheelchairs.

g.      Using administrative separation lockdown cells for housing mobility disabled prisoners who use crutches.

h.      Feeding prisoners in administrative separation lockdown cells using a procedure requiring all inmates, including mobility disabled prisoners using crutches, to walk carrying food trays.

i.      Failing to implement and enforce a modification in the procedure for feeding prisoners in administrative separation lockdown cells so that mobility disabled prisoners using crutches will not have to walk while carrying a food tray.

j.      Failure to provide an adequate system for making available to prisoners any medications prescribed prior to the prisoner being booked into the jail.

k.      Failing to provide an adequate system for timely responding to emergencies.

l.      Failing to implement and enforce an adequate system for providing timely and

appropriate follow-up medical care;

m.   Taking unjustifiable budgetary considerations into account in making decisions on whether to provide medical care to prisoners;

n.   Failing to provide an adequate policy, procedure, and system for reporting and intervening in contracted healthcare providers' deliberate indifference to obvious serious medical needs of prisoners.

o.   Not always giving prisoners handbooks that include the grievance procedure, not telling prisoners the procedure when staff are orally complained to, not informing disabled and special needs prisoners of their right to make grievances, and generally creating obstacles for presentation of grievances to prevent their being submitted.

107.   The County's policies, procedures, and customs constituted reckless disregard of a substantial risk of serious harm to prisoners, including Mrs. Cadena.

108.   The County's policies, procedures, and customs, and the conditions of confinement, and the jail staff's wrongful conduct being sufficiently extended and pervasive, were deliberately indifferent to Mrs. Cadena's serious medical needs, and violated her rights as guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution.

109.   The County's polices, procedures, and customs, or lack thereof, were an unlawful condition of confinement that permitted and resulted in the jail staff being deliberately indifferent to Mrs. Cadena's serious medical needs and denied her adequate medical care in violation of her rights as guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution.

110.   The County did not mail the letter Mrs. Cadena wrote to the Inspector General to complain of the County's actions and inactions, and in not sending the letter the County violated the Free Speech and Right to Petition Clauses of the First Amendment of the United States

Constitution for the attempt to send it to the Inspector General and the Free Speech and Right to Petition Clauses of the First Amendment as applied to the States and their political subdivisions under the Fourteenth Amendment since it would have been forwarded to the County.

111.    As a result of the County's violations of Mrs. Cadena's Constitutional rights, she suffered a dreadful failure of the hardware in her severely broken leg, nerve damage, and needless suffering of severe physical pain, mental anguish, severe emotional distress during her incarceration in the Downtown Jail, and must now live the remainder of her life with a leg that is painful, weak, swollen, disfigured, shorter than her other leg, and with nerve damage and no feeling and movement of her shin and two small toes. Accordingly, Mrs. Cadena is entitled to economic damages in the amount of her medical bills, and noneconomic and punitive damages in an amount to be determined at trial for the violation of 42 U.S.C. §1983, and plaintiff's attorney fees and costs pursuant to 42 U.S.C. §1988.

**C.    Count Three:  Violations of Civil Rights by Defendant Corizon Health, Inc.**

112.    Plaintiff April Cadena re-alleges paragraphs 1-76.

113.    Count Three is brought pursuant to 42 U.S.C. §1983 to redress Defendant Corizon Health, Inc.'s violations of the First, Eighth, and Fourteenth Amendments to the United States Constitution.

114.    Section 1983 provides remedies for violations of rights secured by the Constitution and laws of the United States. The law provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

115.    At all times material to this action, Defendant Corizon's staff, its doctor, nurses, and

other employees, worked in the course and scope of their employment and under color of State law.

116.     Corizon was deliberately indifferent to the serious medical needs of Mrs. Cadena, thus subjecting her to cruel and unusual punishment in violation of the Eighth Amendment and her right to due process of law under the Fourteenth Amendment.

117.     Corizon subjected Mrs. Cadena to conditions of confinement in the jail and the jail's medical clinic that were cruel and unusual punishment in violation of the Eighth Amendment and her right to due process of law under the Fourteenth Amendment.

118.     On information and belief Corizon's policymakers and its staff at the jail knew LVN's were not qualified to perform the intake/receiving screening processing of prisoners, including the triage and assessment of their health, and that registered nurses (RN's) would have to perform the duties for adequate medical care to be given, but despite that knowledge the policymakers contracted with the County to have LVN's perform the duties, supervisors assigned LVN's to perform the duties, the LVN's performed the duties, and RN's and supervisors who knew LVN's were performing the duties said nothing and allowed the practice to continue, knowing it posed a serious risk of harm to prisoners including Mrs. Cadena, and this deliberate indifference to their serious medical needs resulted in Mrs. Cadena being deprived of a wheelchair, being given crutches, and her falling and suffering severe pain and injuries.

119.     Corizon's staff knew Mrs. Cadena was booked into the jail in a wheelchair with a disabling injury, a severely broken leg, and prescription pain medicine in her possession, and that she could not walk with crutches and that her Providence Hospital doctor treated the injury with surgery, instructed her to use the wheelchair, a walker, and prescription pain medicine during her recovery, but despite that knowledge they:

a.     Interfered with the doctor's treatment and instructions for her recovery by denying

her use of the wheelchair and refused to accommodate her disability and discriminated against her because of it and instead required her to use crutches knowing it posed a substantial risk of harm to her, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her falling and suffering severe pain and injuries;

b.      Denied her use of a wheelchair and refused to accommodate her disability and discriminated against her because of it and instead required her to use crutches knowing it posed a substantial risk of serious harm to her, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her falling and suffering severe pain and injuries.

120.    Corizon's staff knew Mrs. Cadena was placed in Cellblock 1130 in a wheelchair with a disabling injury, a severely broken leg, that after a decision was made to take away the wheelchair and give her crutches she could not use the crutches to walk, and that in this cellblock she would have to walk from her cell to the cellblock door and return carrying crutches and a food tray to eat in her cell, but despite that knowledge they did not advise the jail staff to move her out of Cellblock 1130 to another cellblock where she could eat in a day room and not have to walk carrying crutches and a food tray and refused to accommodate her disability and discriminated against her because of it, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her falling and suffering severe pain and injuries.

121.    Corizon's staff knew Mrs. Cadena was in severe pain after she was required to walk to the medical clinic, they knew she was prescribed pain medicine and had it in her possession when she was booked into jail, and they knew the jail nurses refused to administer it, but they nevertheless refused to administer her pain medicine and refused to accommodate her disability and discriminated

against her because of it, knowing it posed a substantial risk of harm to her, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her suffering severe pain and injury.

122.    Corizon's staff knew Mrs. Cadena's leg was severely injured in her fall in the jail and they knew she had a serious medical need for treatment of her leg, but they nevertheless denied her treatment for the leg during the period of delay before sending her to the UMC emergency room and refused to accommodate her disability and discriminated against her because of it knowing it posed a substantial risk of harm to her, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her suffering severe pain and injury.

123.    Corizon's staff knew Mrs. Cadena's leg was severely injured in her fall at the jail, they knew she was in severe pain from dreadful failure of the hardware in her severely broken leg, and they knew she had been prescribed pain medicine, but for a period of time after she suffered the failure of hardware and had returned from UMC Hospital they nevertheless denied her pain medicine and refused to accommodate her disability and discriminated against her because of it knowing it posed a substantial risk of harm to her, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her suffering severe pain and injury.

124.    Corizon's staff knew Mrs. Cadena suffered a dreadful failure of the hardware in her severely broken leg and they knew she had a serious medical need for treatment of the leg, but after she returned from UMC hospital they nevertheless refused to treat her severely broken leg and refused to revise or replace the failed hardware and refused to accommodate her disability and discriminated against her because of it knowing it posed a substantial risk of harm to her, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her suffering severe pain and injury.

125.     The above described wrongful conduct, the actions and inactions of Corizon's staff, were the result of the following customs, policies, or practices of Defendant Corizon:

a.     Assigning unqualified staff, LVN's, to perform the intake/receiving screening processing and assessing of the health of prisoners entering the jail.

b.     Failing to implement and enforce adequate policies and procedures regarding the needs of mobility disabled prisoners who use mobility aids.

c.     Failing to train its staff regarding the needs of mobility disabled prisoners who use mobility aids.

d.     Failing to train its staff on the conditions of confinement of the County's general jail population insofar as it relates to the needs of mobility disabled prisoners who use mobility aids and their special accessibility considerations.

e.     Failing to train its staff on the conditions of confinement of prisoners in lockdown cells, including cells in Cellblock 1130, insofar as it relates to the needs of mobility disabled prisoners who use mobility aids and their special accessibility considerations.

f.     Failure to train its staff to keep accurate records of mobility and special accessibility considerations for each prisoner booked into the jail.

g.     Taking unjustifiable consideration into account of the County not having sufficient cells to house mobility disabled prisoners who use mobility aids.

h.     Failure to provide an adequate system for making available to prisoners any medications prescribed prior to the prisoner being booked into the jail.

i.     Failing to provide an adequate system for timely responding to emergencies.

j.     Failing to implement and enforce an adequate system for providing timely and

appropriate follow-up medical care;

k.      Taking unjustifiable consideration into account of the minimization of the County's costs for providing medical care to prisoners.

l.      Failing to provide an adequate policy, procedure, and system for reporting and intervening in the jail doctor's deliberate indifference to obvious serious medical needs of prisoners.

m.      Administering psychotropic medicines to sedate and improperly control the behavior of prisoners rather than as a medication for psychiatric conditions.

126.    Corizon's policies, procedures, and customs, constituted reckless disregard of a substantial risk of serious harm to prisoners, including Mrs. Cadena.

127.    Corizon's polices, procedures, and customs, and the conditions of confinement, and the Corizon staff's wrongful conduct being sufficiently extended and pervasive, were deliberately indifferent to Mrs. Cadena's serious medical needs, and violated her rights as guaranteed by the First, Eighth, and Fourteenth Amendments of the United States Constitution.

128.    Corizon's policies, procedures, and customs, or lack thereof, were an unlawful condition of confinement that permitted and resulted in the Corizon staff being deliberately indifferent to Mrs. Cadena's serious medical needs and denied her adequate medical care in violation of her rights as guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution.

129.    Corizon punished Mrs. Cadena for repeatedly complaining about not being taken to the hospital for surgery and prevented her from continuing to complain more than she did by sedating her with psychotropic drugs and pain medicine and chilled freedom of speech, in violation of the Free Speech and the Right to Petition Clauses of the First Amendment as applied to the States and

their political subdivisions under the Fourteenth Amendment to the United States Constitution.

130. As a result of Corizon's violations of Mrs. Cadena's Constitutional rights, she suffered a dreadful failure of the hardware in her severely broken leg, nerve damage, and needless suffering of severe physical pain, mental anguish, and severe emotional distress during her incarceration in the Downtown Jail, and must now live the remainder of her life with a leg that is painful, weak, swollen, disfigured, shorter than her other leg, and with nerve damage and no feeling and movement of her shin and two small toes. Accordingly, Mrs. Cadena is entitled to economic damages in the amount of her medical bills, and noneconomic and punitive damages in an amount to be determined at trial for the violation of 42 U.S.C. §1983, and plaintiff's attorney fees and costs pursuant to 42 U.S.C. §1988.

**D.     Count Four: Violations of Civil Rights by Defendant Dr. Alex Salazar**

131. Plaintiff April Cadena re-alleges paragraphs 1-76.

132. Count Four is brought pursuant to 42 U.S.C. §1983 to redress Defendant Dr. Alex Salazar's violations of the Eighth and Fourteenth Amendments to the United States Constitution.

133. Section 1983 provides remedies for violations of rights secured by the Constitution and laws of the United States. The law provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

134. At all times material to this action, Defendant Alex Salazar worked in the course and scope of his employment with Defendant Corizon and under color of State law.

135. Dr. Salazar was deliberately indifferent to the serious medical needs of Mrs. Cadena, thus subjecting her to cruel and unusual punishment in violation of the Eighth Amendment and her

right to due process of law under the Fourteenth Amendment.

136. On information and belief Dr. Salazar, the on-site Medical Director and physician for the jail's medical clinic, knew LVN's were not qualified to perform the intake/receiving screening processing of prisoners, including the triage and assessment of their health, and that registered nurses (RN's) would have to perform the duties for adequate medical care to be given, but despite that knowledge he assigned or had someone assign LVN's to perform the duties knowing it posed a serious risk of harm to prisoners including Mrs. Cadena, and this deliberate indifference to their serious medical needs resulted in Mrs. Cadena being deprived of a wheelchair, being given crutches, and her falling and suffering severe pain and injuries.

137. Dr. Salazar knew Mrs. Cadena was booked into the jail in a wheelchair with a disabling injury, a severely broken leg, and prescription pain medicine in her possession, and that she could not walk with crutches and that her Providence Hospital doctor treated the injury with surgery, instructed her to use the wheelchair, a walker, and prescription pain medicine during her recovery, but despite that knowledge he:

a. Interfered with the doctor's treatment and instructions for her recovery by denying her use of the wheelchair and refused to accommodate her disability and discriminated against her because of it and instead required her to use crutches knowing it posed a substantial risk of harm to her, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her falling and suffering severe pain and injuries;

b. Denied her use of a wheelchair and refused to accommodate her disability and discriminated against her because of it and instead required her to use crutches knowing it posed a substantial risk of serious harm to her, and this deliberate

indifference to her serious medical needs and condition of confinement resulted in her falling and suffering severe pain and injuries.

138.     Dr. Salazar knew Mrs. Cadena's leg was severely injured in her fall in the jail and he knew she had a serious medical need for treatment of her leg, but on information and belief he nevertheless denied her treatment for the leg during the period of delay before sending her to the UMC emergency room and refused to accommodate her disability and discriminated against her because of it knowing it posed a substantial risk of serious harm to her, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her suffering severe pain and injury.

139.     Dr. Salazar knew Mrs. Cadena's leg was severely injured in her fall at the jail, he knew she was in severe pain from the dreadful failure of the hardware in her severely broken leg, and he knew she had been prescribed pain medicine, but for a period of time after she suffered the failure of hardware and had returned from UMC hospital he nevertheless denied her pain medicine knowing it posed a substantial risk of serious harm to her and refused to accommodate her disability and discriminated against her because of it, and this deliberate indifference to her serious medical needs and condition of confinement resulted in her suffering severe pain and injury.

140.     Dr. Salazar knew Mrs. Cadena suffered a dreadful failure of the hardware in her severely broken leg and he knew she had a serious medical need for treatment of the leg, but after she returned from UMC hospital he nevertheless denied her treatment and refused to accommodate her disability and discriminated against her because of it, knowing it posed a substantial risk of harm to her, and this deliberate indifference to her serious medical needs resulted in her suffering severe pain and injury.

141.     Dr. Salazar's wrongful conduct, his actions and inactions, constituted reckless

disregard of a substantial risk of serious harm to Mrs. Cadena.

142.     Dr. Salazar's wrongful conduct being sufficiently extended and pervasive, was deliberately indifferent to Mrs. Cadena's serious medical needs, and violated her rights as guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution.

143.     As a result of Dr. Salazar's violations of Mrs. Cadena's Constitutional rights, she suffered a dreadful failure of the hardware in her severely broken leg, nerve damage, and needless suffering of severe physical pain, mental anguish, severe emotional distress during her incarceration in the Downtown Jail, and must now live the remainder of her life with a leg that is painful, weak, swollen, disfigured, shorter than her other leg, and with nerve damage and no feeling and movement of her shin and two small toes. Accordingly, Mrs. Cadena is entitled to economic damages in the amount of her medical bills, and noneconomic and punitive damages in an amount to be determined at trial for the violation of 42 U.S.C. §1983, and plaintiff's attorney fees and costs pursuant to 42 U.S.C. §1988.

## VII.  Prayer

WHEREFORE, Plaintiff April Cadena prays for relief as follows:

a.      Declaratory judgment that Defendants violated Mrs. Cadena's constitutional, civil, and statutory rights;

b.      An award of appropriate compensatory and punitive damages against each Defendant in favor of Mrs. Cadena;

c.      An award of attorney's fees, costs, and litigation expenses, including expert witness fees, pursuant to 42 U.S.C. §1983, 42 U.S.C. §12205, 29 U.S.C. §794(b), and 42 U.S.C. §1988;

c.      Prejudgment and post-judgment interest; and

c. For such other and further relief as the Court may deem just and appropriate.

**Jury Trial Demanded**

Plaintiff April Cadena demands trial by jury.

Respectfully submitted,

  /s/ Perry Pinon
PERRY PINON
Attorney for Plaintiff
State Bar No. 16016350
1312 Montana Ave.
El Paso, Texas   79902
(915)  546-9190
Fax (915) 546-9192
perrypinonatty@aol.com
