**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

FILED

2017 SEP 15  PM 3: 53

U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

APRIL CADENA,                                    )
                                                 )
          Plaintiff,                             )
                                                 )
v.                                               )        Cause No. 3:16-CV-00209-FM-RFC
                                                 )
EL PASO COUNTY,                                  )
CORIZON HEALTH, INC., and                        )
ALEX SALAZAR, M.D.                               )

## PLAINTIFF'S RESPONSE TO DEFENDANTS CORIZON AND SALAZAR'S MOTION FOR SUMMARY JUDGMENT

Plaintiff APRIL CADENA asks the Court to deny Defendants' Motion For Summary Judgment because there are genuine issues of material fact for each element of her claims.

### I. Introduction

1.      Mrs. Cadena brings this lawsuit against Defendants Corizon and Salazar for violations of 42 U.S.C. §1983 ("Section 1983"). She was a prisoner in the downtown El Paso County jail. While incarcerated, Mrs. Cadena suffered severe injuries, pain, emotional distress, and mental anguish because of the Defendants' deliberate indifference to her serious medical needs, conditions of confinement, and violation of her first amendment right to freedom of speech.

### II.  Statement of Relevant Facts

2.      Filed simultaneously with this response are the following: 1) Plaintiff's Objections to Defendant's Evidence; 2) Plaintiff's Statement of Facts, and 3) Plaintiff's Exhibits in Support of Response to Motion for Summary Judgment.

### III. Standard of Review for Summary Judgment

3.      Although summary judgment is proper in a case where there is no genuine issue of material fact, this is not a case in which the Court should grant summary judgment. See Fed. R. Civ.

P. 56(a); <u>Tolan v. Cotton</u>, __ U.S. __, 134 S. Ct. 1861, 1866 (2014); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).

4.     A defendant moving for summary judgment on a plaintiff's claim must demonstrate the absence of a genuine issue of material fact by either (1) submitting summary judgment evidence that negates the existence of a material element of plaintiff's claim or (2) showing there is no evidence to support an essential element of plaintiff's claim. See <u>Celotex Corp.</u>, 477 U.S. at 322-23; <u>J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.</u>, 76 F.3d 1245, 1251 (1st Cir. 1996). Defendant cannot rely on conclusory statements to establish that Plaintiff has not presented evidence on an essential element of his claim. Rather, Defendant must demonstrate the absence of a genuine factual dispute. See <u>Celotex Corp.</u>, 477 U.S. at 324-25. Only if Defendant meets its burden is Plaintiff required to respond by summary judgment proof to show a genuine issue of material fact. See Fed. R. Civ. P. 56(e)(3).

5.     In determining whether there is a disputed issue of material fact that prevents summary judgment, a court must consider all evidence in the light most favorable to plaintiff as the nonmovant. <u>Tolan</u>, __ U.S. __, 134 S. Ct. at 1866; <u>Garcia v. Pueblo Country Club</u>, 299 F.3d 1233, 1236-37 (10th Cir. 2002). The Court must also resolve all reasonable doubts about the facts in favor of plaintiff as the nonmovant. <u>Tolan</u>, __ U.S. at __, 134 S. Ct. At 1866; <u>Cooper Tire & Rubber Co. v. Farese</u>, 423 F.3d 446, 456 (5th Cir. 2005).

## IV. ARGUMENT AND AUTHORITIES

6.     "For too many prisoners, the Eighth Amendment does not ensure adequate medical care. Prison medical providers may be aware of their constitutional obligations, but they are also well aware of the conflicting need to limit costs. They employ practices that functionally deny adequate care while appearing to address the medical concerns that prisoners have." Joel H. Thompson,

Today's Deliberate Indifference: Providing Attention Without Providing Treatment to Prisoners with Serious Medical Needs, 45 Harvard Civil Rights-Civil Liberties Law Review, 635, 652. (2010).

**A.     Applicable Law**

7.     Section 1983 liability results when a "person" acting "under color of" state law, deprives another of rights "secured by the Constitution" or federal law. 42 U.S.C. § 1983.

**(i)     Constitutional violations for deliberate indifference to serious medical needs and conditions of confinement.**

8.     In Estelle v. Gamble, the Supreme Court held "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's need or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." 429 U.S. 97, 104-105 (1976).

9.     In Wilson v. Seiter the Supreme Court held Section 1983 claims asserting conditions of confinement in violation of the Eighth Amendment require the prisoner to prove deliberate indifference, or callous indifference, or reckless disregard of constitutional rights; simple negligence is not sufficient. 501 U.S. 294 (1991)

10.     Deliberate indifference under both the Eighth and the Fourteenth Amendments are subject to the same standards. Gibbs v. Grimmette, 254 F.3d 545, 548, (5th Cir. 2001).

**(ii)     Requirements for liability of local governments and private defendants.**

11.     Imposition of liability on a local governmental entity fundamentally requires identification of a "policy" or "custom" of the government that is the moving force behind the constitutional violation. In re Foust, 310 F.3d 849, 861 (5th Cir. 2002). See also Monell v. Dep't of

Soc. Servs., 436 U.S. 658, 691 (1978).

12.     When the defendants are private actors, the challenged "conduct allegedly causing

the deprivation of a federal right" must be "fairly attributable to the State" for Section 1983 to apply.

See Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982); Doe v. U.S., 831 F.3d 309, 314 (5th Cir.

2016). The Supreme Court has used at least four tests to determine whether private conduct is "fairly

attributable to the State . . . ." Doe v. U.S. at 314, citing Cornish v. Corr. Servs. Corp., 402 F.3d 545,

550 (5th Cir. 2005). The four tests are the "public function test," the "state compulsion test," the

"nexus" or "state action test," and the "joint action test." Cornish, at 549-550.[1]

13.     The Fifth Circuit does not appear to have ruled on whether Monell's requirement for

a policy or custom extends to private entities. One district court has required it. See Chambers v. A-

Avalon Corr. Servs., No. 4:15-CV-387-A, 2015 U.S. Dist. Lexis 141475, at *5-6 (N.D. Tex. Octo.

19, 2015). In dicta another district court noted the absence of any pleading of policy or custom. See

Callaway v. City of Austin, No. A-15-CV-00103-SS, 2015 U.S. Dist. Lexis 91364, at *10.

(iii)     **The Fifth Circuit's definition of policy, custom, and practice**

14.     The Fifth Circuit has the following definition of a governmental policy for purposes

---

[1] In Cornish, the Fifth Circuit discussed the four tests: "The 'public function test' examines whether the private entity performs a function which is "exclusively reserved to the State". Flagg Brothers, Inc. v. Brooks, 436 U.S. 149, 158, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). Under the 'state compulsion test', a private actor's conduct is attributable to the State when it exerts coercive power over the private entity or provides significant encouragement. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 170-71, 90 S.Ct. 1598, 26 L.Ed.2d 142 550*550 (1970). The 'nexus' or 'state action test' considers whether the State has inserted 'itself into a position of interdependence with the [private actor, such] that it was a joint participant in the enterprise'. Jackson v. Metro. Edison Co., 419 U.S. 345, 357-58, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); see also Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). And, under the 'joint action test', private actors will be considered state actors where they are 'willful participant[s] in joint action with the State or its agents'. Dennis v. Sparks, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). The Supreme Court has not resolved '[w]hether these different tests are actually different in operation or simply different ways of characterizing [this] necessarily fact-bound inquiry....' Lugar, 457 U.S. at 939, 457 U.S. 922." Cornish, at 549-550.

of Section 1983 liability;

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

Johnson v. Deep East Texas Regional Narcotics, 379 F. 3d 293, 309 (5th Cir. 2004) quoting Johnson

v. Moore, 958 F.2d 92, 94 (5th Cir.1992).

### (iv)    Proving constitutional violations with evidence of deliberate indifference and conditions of confinement.

15.    In Farmer v. Brennan, the Supreme Court held that in order to establish an Eighth

Amendment claim under a theory of deliberate indifference, the plaintiff must show that "the official

knows of and disregards an excessive risk to inmate health or safety; the official must both be aware

of facts from which the inference could be drawn that a substantial risk of serious harm exists, and

he must also draw the inference." 511 U.S. 825, 837 (1994). The Court explained that this

"subjective recklessness" standard does not require the plaintiff to "show that a prison official acted

or failed to act believing that harm actually would befall an inmate; it is enough that the official acted

or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842; see also

Domino v. Tex. Dep't. of Criminal Justice, 239 F.3d 752, 755 (5th Cir. 2001). To meet this standard,

a plaintiff must establish more than mere negligence, unreasonable response, or medical malpractice.

Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006).

16.    Circumstantial evidence may sufficiently establish the subjective recklessness

standard. "Whether a prison official had the requisite knowledge of a substantial risk is a question

of fact subject to demonstration in the usual way, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (citations omitted.) Farmer, 511 U.S. at 842. The Fifth Circuit has found deliberate indifference when the plaintiff alleges facts of an apparent or obvious risk to a prisoner's health, supporting an inference that the official had "actual awareness" of a serious medical need.[2]

17.   In Bell v. Wolfish, 441 U.S. 520 (1979), the Supreme Court stated that "[i]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." Id. at 539. The Fifth Circuit addressed this issue, in Hare v. City of Corinth, making clear that a plaintiff must show deliberate indifference on the part of the municipality only in a case in which the constitutional violation resulted from an episodic act or omission of a state actor. 774 F.3d 633, 644 (5th Cir. 1996) (en banc). In cases grounded in unconstitutional conditions of confinement, the plaintiff needs only show the condition has no reasonable relationship to a legitimate governmental interest. Duvall v. Dallas County, 631 F.3d 203 (2011). In a conditions of confinement claim, "an avowed or presumed intent by the State or its jail officials exists in the form of the challenged condition, practice, rule, or restriction." Hare at 644. As the Fifth Circuit has recognized, "the reasonable relationship test employed in conditions cases is functionally equivalent to the deliberate indifference standard employed in episodic cases." Duvall v. Dallas County, 631 F.3d 203 (2011) quoting Scott v. Moore,

---

[2] See, e.g., United States v. Gonzales, 436 F.3d 560, 573-74 (5th Cir. 2006) (upholding a finding of deliberate indifference when evidence established that officers failed to seek medical assistance for a detainee who was lying on the ground with a broken neck, "foaming at the mouth," begging for help, and yelling "take me to a hospital"); Austin v. Johnson, 328 F.3d 204, 210 (5th Cir. 2003) (inferring deliberate indifference when a minor was unconscious and vomiting for two hours before officials sought medical help); Harris v. Hegmann, 198 F.3d 153, 159-60 (5th Cir. 1999) (finding deliberate indifference when prison officials ignored repeated requests for immediate, emergency care and ignored multiple reports of "excruciating pain" caused by the dislocation of a prisoner's jaw).

114 F.3d 51, 54 (5th Cir. 1997) (en banc).

18.     In <u>Duvall</u>, the Fifth Circuit stated, "[E]ven where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices." <u>Duval</u>, 631 F.3d at 207, quoting <u>Hare</u>, 74 F.3d at 644.

> In some cases, a condition may reflect an unstated or de facto policy, as evidenced by a pattern of acts or omissions "sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.

<u>Duvall,</u> at 207, quoting <u>Shepherd v. Dallas County</u>, 591 F.3d 445, 452 (5th Cir. 2009), quoting <u>Hare</u>.

## B.     Argument

19.     Because prisoners are in the custody of the state and are unable to seek medical assistance on their own, the state is under a duty to provide adequate treatment. <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976). Deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. <u>Id</u>, at 104, citing <u>Gregg v. Georgia</u>, 428 U.S. 153, 173 (1976). "[A]cts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" of inmates constitute cruel and unusual punishment." <u>Id</u>, at 106; accord, <u>Dickson v. Colman</u>, 569 F.2d 1310, 1311 (5th Cir.) (per curiam), cert. denied, 439 U.S. 897, 99 S.Ct. 259, 58 L.Ed.2d 244 (1978).

20.     El Paso County shall provide safe and suitable jails for the county. Local Gov't Code, Sec. 351.001. The Sheriff is the administrator and keeper of the downtown jail and is required to safely keep all prisoners committed to the jail. SOF 14-15; Local Gov't Code Sec. 351.034; 351.041.

21.     Corizon contracted with El Paso County to provide medical services to the County's prisoners. SOF 20-29. When it was responsible for providing such care, Corizon was acting under

color of State law. Its contract with the County to provide the services was for private conduct that is "fairly attributable to the State" under the public function test, the nexus or state action test, and the joint action test. See SOF 20-29; Doe v. U.S. at 314, citing Cornish v. Corr. Servs. Corp., 402 F.3d 545, 550 (5th Cir. 2005), footnote 1.

22.     Dr. Salazar was Corizon's medical director and physician for its medical clinic in the downtown jail. SOF 17-18. He was a policymaker. SOF 18. While he was responsible for performing his duties, Dr. Salazar was also acting under color of State law for the same reasons stated above.

**(i)     The use of LVNs to perform intake receiving screening of prisoners was a deliberate indifference to Mrs. Cadena's serious medical needs that violated her civil rights and was a moving force and cause of her being injured in the jail.**

23.     Not having qualified personnel to handle medical matters can result in constitutional violations. Gates v. Collier, 501 F.2d 1291, 1301-1303 (5th Cir. 1974) (failure to have full-time qualified medical personnel). Corizon has a custom of using licensed vocational nurses (LVNs) to perform intake receiving screening of prisoners. They are the only nurses it schedules to perform the duties. SOF 31. Charles Guffey, Corizon's Regional Vice President testified Corizon uses LVNs because they are paid less than registered nurses (RNs). It saves Corizon and the contracting entity money. SOF 30. Dr. Salazar knew registered nurses (RNs) have more training than LVNs, and more importantly, he knew LVNs are not supposed to do assessments. SOF 32. Dr. Salazar knew LVNs were performing intake receiving screening and he nevertheless allowed them to do it, saying it was their job. SOF 31. He even used LVNs to perform physical examinations of prisoners. SOF 31.

24.     The receiving screening of prisoners entering the County jail serves the important function of determining the disposition and referrals of the inmate. SOF 31, 33-36. The person performing it is supposed to identify potential clinical conditions and triage appropriately. SOF 27-28, 31. Dr. Salazar described triage as occurring in a hospital emergency room. He believes the jail

is like that in terms of people coming in with all kinds of ailments, and the receiving screening is for the purpose of figuring out what is to be done with the inmate. SOF 28. Sometimes a decision is made to send the person to the emergency room. SOF 28.

25.     Corizon's intake nurses fill out a Receiving and Screening form that consists of three pages. The form includes sections for Critical Observation, Vital Signs, History, Communicable Diseases, Chronic Illnesses, Mental Health, Examination, Disposition, and Additional Comments. It has many boxes that are marked to make a record during the intake receiving screening. SOF 33.

26.     Performing Corizon's receiving screening duties requires the nurse to make very important medical assessments. The Critical Observation section of the Intake Receiving Screening form asks if any Urgent/Emergent Medical Referral, Urgent/Emergent Security Referral, and Urgent/Emergent Mental Health Referral are needed. SOF 34. More importantly for Mrs. Cadena's case, this section of the form also asks if the prisoner has mobility restrictions. SOF 34. The Disposition section includes options for referrals of housing placement in the jail, and options for referrals for additional medical, mental, or dental care. SOF 35-36. Dr. Salazar knew LVN's make the referrals in the Critical Observation and Disposition sections. SOF 31.

27.     Mrs. Cadena suffered a severely broken leg. Dr. Alost, orthopedic surgeon, implanted hardware in the surgery. Providence Hospital's physical therapist determined she was unable to use crutches and a walker. On June 22, 2014, Dr. Alost had her discharged in a wheelchair and with a walker and instructions for her to be non-weight bearing on the leg. SOF 9.

28.     On June 23, 2014, Nurse Portillo, LVN, performed the receiving screening of Mrs. Cadena. SOF 37-39. She asked if she could walk. Mrs. Cadena answered no, saying that was why she was in a wheelchair. Mrs. Cadena did for a moment stand up before sitting down again. SOF 39. In Additional Comments, Nurse Portillo noted, "Pt in wheelchair, able to stand independently." SOF

39. Based solely on Mrs. Cadena's ability to stand up, Nurse Portillo put a slash through the box stating she did not have a mobility restriction. SOF 38. In the disposition section, she placed a slash through the box for GP (General Population) instead of selecting other options. SOF 38.

29.    It can be inferred from Nurse Portillo's marks on the receiving screening form that she made the assessment Mrs. Cadena was not mobility impaired and could be placed in the general population based only on the fact Mrs. Cadena could stand. Corizon's use of unqualified personnel, LVNs, to perform mobility assessments is a deliberate indifference to Mrs. Cadena and other prisoners' serious medical needs because Dr. Salazar, Medical Director, physician, supervisor, and policymaker, knew LVNs were not supposed to make assessments. See SOF 17-18, 32. Dr. Salazar's toleration of Corizon's custom of using LVNs for intake receiving screening and his use of the LVNs for this purpose, is likewise a deliberate indifference to serious medical needs and reckless disregard to prisoners with serious medical conditions affecting their mobility.

30.    Corizon's custom of using LVNs for intake receiving screening was the moving force behind the constitutional violation. See In re Foust, 310 F.3d 849, 861 (5th Cir. 2002). See also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). After performing the intake receiving screening and making its assessments, Nurse Portillo called Dr. Salazar. SOF 43. Dr. Salazar does not remember the conversation. SOF 43. However, we know Nurse Portillo addressed Mrs. Cadena's mobility because on June 23, she recorded the following telephone order from Dr. Salazar.

> Norco 1-2 tabs BID x 2 weeks - F/U with orthopedic in 2 weeks - crutches to be given and lower bunk inmate until cleared. Woundcare to ® leg.

SOF 43. Pursuant to the order, on June 23, Nurse Portillo prepared the following special medical instructions for the detention personnel: "Doctor recommends lower bunk. May keep crutches. Doctor recommends lockdown. SOF 44. On June 24, the instructions were issued to the floor

detention officers. SOF 45. The unusual language, "May keep," is typical of wording used by clinic personnel. Cpl. Pina., a detention officer for 24 years, testified "May keep" means, "[t]hey are going to be given . . . ." SOF 61. Corizon's own medical records show "may keep" and "keep" are intended to mean "give." SOF 62. While there is a notation in the special instructions given to the detention officers that states, "Wheelchair in possession" (SOF 46), it is not a special medical instruction or order from the doctor authorizing it. Other evidence of there being no prior order and instruction for a wheelchair is the order and special instruction of June 25 stating "may keep wheelchair," which of course means there was no prior order or instruction  for a wheelchair and that this is the order to "give" her one. See SOF 60-62 and paragraph below.

31.    Mrs. Cadena was placed in Cellblock 1130, a single occupant lockdown cell, and not in the medical ward or Cellblock 1120 which is an ADA cellblock. SOF 50-55. On June 24, Nurse Portillo and a detention officer gave her the crutches and took away the wheelchair. SOF 56, 61. (Remember, Dr. Salazar had not authorized the wheelchair.) Later that day Det. Off. Davila and Det. Off. Pina had Mrs. Cadena try to walk to the clinic using the crutches. After almost falling, she was taken there in a wheelchair. SOF 57. In the clinic Mrs. Cadena complained she was unable to use crutches. SOF 58. Det. Off. Davila returned Mrs. Cadena to her cell leaving only the crutches and taking the wheelchair with her. SOF 59. In the morning of June 25, at 10:37, Keith Barnes, PA, gave an order, and a special medical instruction was given, that included, "May keep wheelchair." SOF 60. The instruction of course means, "They are to give a wheelchair" to Mrs. Cadena. This was the only authorization for a wheelchair for Mrs. Cadena, and it is evidence that Mrs. Cadena no longer had a wheelchair. Otherwise, why give the order?

32.    On June 25, at dinner time, a detention officer remotely opened Mrs. Cadena's cell door and required her to walk from her cell to the cellblock door to get her food tray. Mrs. Cadena

was hungry and the officer would not bring her the food. Despite the no weight bearing instructions, she walked to the cellblock door trying to use the crutches. Mrs. Cadena asked to eat at the common room table, but her request was denied. At the door, Mrs. Cadena was given a food tray and carrying it in her hands and holding the crutches in her armpits, she walked back to her cell. Inside her cell she was in a lot of pain, felt weak, and was shaking. She tried to put the tray on the small table in her cell when the drink spilled, and she slipped and fell on her bad leg. SOF 69-78.

33.     Had Corizon not had the custom of using LVNs to perform the receiving screening of prisoners, and had Dr. Salazar not tolerated the custom and used the LVN nurses to perform the work, Nurse Portillo would not have been on duty to make the assessments that Mrs. Cadena did not have a mobility restriction and could be placed in the general population. Had she not made the assessment, Dr. Salazar would not have relied on what was said in their conversation and given the order that authorized only the use of crutches. For these reasons, there is an affirmative link and evidence of causation exists between the violation of her civil rights and the injuries Mrs. Cadena sustained in the fall and the harm she experienced in the medical ward before she was released. See SOF 77-87, 89-93, 96-98, 102-103, 111, 115, 119, 123-125, 129, 142, 145, 147-end.

**(ii)     The use of LVNs to perform intake receiving screening of prisoners and the resulting placement of Mrs. Cadena in the jail without her wheelchair was a condition of confinement that violated her civil rights and caused her harm.**

34.     The system of providing medical care to inmates can cause an unlawful condition of confinement. Shepherd v. Dallas County, 591 F.3d 445, 453-454 (5th Cir. 2009); Williams v. Edwards, 547 F.2d 1206, 1209, 1215-1218 (5th Cir. 1977) (medical care delivery system deprived inmates of rights). Gates v. Collier, 501 F.2d 1291, 1301-1303 (5th Cir. 1974) (failure to have full-time qualified medical personnel). In Shepard, the Fifth Circuit considered the jail's evaluation, monitoring and treatment of inmates with chronic illness before finding that serious injury and death

were the inevitable result of the jail's gross inattention to the needs of inmates with chronic illness, and that in the absence of legitimate penological or administrative goals, it amounted to punishment. Shepard at 453-454. Regarding the evaluation of inmates, the Fifth Circuit considered evidence of failure to adequately identify their health needs through appropriate intake screening and failure to ensure inmates received thorough assessments. Shepard, at 451. Other circuits have held similarly.[3]

35.     The role LVNs had in Corizon's receiving screening process, and Dr. Salazar's reliance on them to make assessments of the mobility of prisoners and referrals for medical care and placement in housing based on their assessments has already been discussed. Qualified personnel are needed to perform assessments. The failure to have appropriate intake screening personnel to make informed and thorough assessments that can be relied on for housing of prisoners and authorizing the use of mobility aids was an unlawful condition of confinement that caused Mrs. Cadena to fall and be injured.

**(iii)     The decision to authorize the use of crutches and not the wheelchair interfered with Mrs. Cadena's orthopedic surgeon's instructions and was deliberately indifferent to her serious medical needs and a reckless disregard of her medical condition in violation of her civil rights that caused her injury.**

36.     Intentionally interfering with treatment prescribed by a physician can be a deliberate indifference to serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104–105 (1976).

37.     Mrs. Cadena sustained fractures of the tibia and fibula of her right leg. Dr. Thomas Alost performed the surgery to insert the metal rod in Mrs. Cadena's leg at Providence Hospital. Before her discharge from the hospital, Dr. Alost had a physical therapist work with Mrs. Cadena

---

[3] In the Ninth Circuit, a physically disabled inmate placed in administrative segregation without access to his wheelchair was found to have a valid due process claim since "the conditions imposed on (the inmate), by virtue of his disability, constituted an atypical and significant hardship on him." Serrano v. Francis, 345 F.3d 1071, 1078-1079 (9th Cir. 2003, cert denied, 543 U.S. 825 (2004).

so she could follow his instructions to be non-weight bearing on the leg. After trying to get Mrs. Cadena to walk with crutches and a walker, the therapist determined she could not use crutches and might not be able to use a walker, and informed Dr. Alost. Dr. Alost then had Mrs. Cadena discharged from the hospital with instructions to use a wheelchair and a walker. SOF 9.

38.    Dr. Salazar authorized the use of crutches, but did not authorize the use of a wheelchair. SOF 43-46, 9-11. In deposition, Dr. Salazar deferred to the knowledge of the orthopedic surgeon in discussing treatment of the leg saying, "I am not an orthopedic surgeon" and "that would be up to the orthopedic surgeon." SOF 103. However, for a mobility aid, he did not.

39.    The order to give crutches and the decision to not authorize the wheelchair interfered with Dr. Alost's order for Mrs. Cadena to use a wheelchair to be non-weight bearing on the leg. Dr. Salazar said the reason for his order for crutches was so Mrs. Cadena could have the option of using crutches or a wheelchair. **Salazar Dep. 69.** This testimony is not credible because he did not authorize the use of a wheelchair. It can be inferred the reason for Nurse Portillo's telephone call was so a decision could be made on what mobility aid Mrs. Cadena would be allowed to have. It can be made because of the assessment there was no mobility restriction, and because of Dr. Salazar's order for crutches. Because a wheelchair was not authorized, there was no legitimate reason for ordering only crutches and there is evidence of interference with Dr. Alost's instructions to use a wheelchair in her recovery. This interference was a reckless disregard for Mrs. Cadena's serious medical condition that violated her civil rights and was a cause of her fall and the injuries she suffered.

   **(iv)    Corizon and Dr. Salazar's consideration of non-medical factors in making decisions on Mrs. Cadena's medical care was a deliberate indifference to her serious medical needs and a violation of her civil rights that was a moving force and cause of her fall and injury and the delay that caused her to suffer harm.**

40.    Evidence of the making of medical decisions based on non-medical factors can

establish a claim of deliberate indifference to serious medical needs. Medical decisions should not be based on factors like the lack of staff or lack of interpreters, budgetary restrictions, because an inmate is about to be released, or for punishment.[4] Denying or delaying access to medical care is actionable under Section 1983. Hutchens v. Alabama, 466 F.2d 507 (CA5 1972) (per curium).

### a. Assisting the County to house prisoners in a deficient facility at the expense of their serious medical needs.

41. The detention officers who first took Mrs. Cadena to Cellblock 1130 said they did not have any space in the County jail for a wheelchair. SOF 54. When Mrs. Cadena was taken to the clinic by Det. Off. Davila and Cpl. Pina, the time she almost fell using the crutches, she asked Nurse Fuentes (Sponge Bob), RN, if they would return the wheelchair explaining that she wasn't able to walk with the crutches and had almost fallen. SOF 54, 58. Nurse Fuentes' response is telling of a Corizon policy or custom that caused her to be injured in the jail. Nurse Fuentes said they did not have space on the floor for an inmate in a wheelchair! SOF 58. Nurse Fuentes responded that he would let the doctor know, and that it was up to the doctor. SOF 58.

42. Commander Vargas testified inmates in wheelchairs were assigned to the medical ward or to ADA cells. SOF 50. The wheelchair accessible cellblock for women was Cellblock 1120.

---

[4] Casey v. Lewis, 834 F. Supp. 1477, 1547–48 (D. Ariz. 1993) (finding that a lack of staff to "diagnose and treat the serious mental health needs" of a prisoner constituted deliberate indifference). Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir.), opinion amended on denial of reh'g, 75 F.3d 448 (9th Cir. 1995) (explaining that failure to provide a translator for medical encounters can constitute deliberate indifference). Jones v. Johnson, 781 F.2d 769, 771 (9th Cir. 1986) (holding that budget constraints could not justify deliberate indifference to a prisoner's serious medical needs); Starbeck v. Linn Cnty. Jail, 871 F. Supp. 1129, 1146 (N.D. Iowa 1994) (holding that refusal to allow a prisoner surgery because the State of Iowa did not want to pay the costs of guards during the prisoner's recovery could rise to deliberate indifference to the prisoner's serious medical need). McKenna v. Wright, 386 F.3d 432, 437 (2d Cir. 2004) (holding that an allegation that a prisoner was "denied urgently needed treatment for a serious disease because he might be released within twelve months of starting the treatment" was enough for a claim of deliberate indifference). Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004) (finding that withholding a necessary dental referral because of a prisoner's behavioral problems could give rise to a finding of deliberate indifference).

It is an ADA cellblock only because it has a shower that is wheelchair accessible. SOF 52. An inmate in a wheelchair in Cellblock 1130 would have to be taken to Cellblock 1120 to take a shower. This is exactly what happened later when Mrs. Cadena took a shower after her return from UMC hospital. SOF 110. Mrs. Cadena testified Cpl. Gunsenhouser saw she was unable to get in the shower, and later that day returned to take her to shower in Cellblock 1120. SOF 110. A shortage of ADA cells causes extra work. At the same time, the medical ward does not have wheelchair accessible cells. After Mrs. Cadena was moved to the ward, she needed help to get to and from her wheelchair which was kept outside of the double occupant cell because it could not fit. SOF 114. Additionally, the ward is for either men or women, and not both. SOF 10. So, accommodating one female inmate in a wheelchair in the ward can mean having to move male inmates out of the ward to other locations.

43.     Because the Downtown County Jail is not ADA compliant, an inmate in a wheelchair poses problems for detention officers and medical clinic personnel. There is an incentive for the officers and medical personnel to get prisoners to use crutches. The actions of Nurse Portillo, Dr. Salazar, and Nurse Fuentes demonstrate a custom of working with detention officers to house inmates in available cells in deliberate indifference to their serious medical needs by having the patient adapt to assigned cell instead of having personnel physically work to accommodate their needs. This custom resulted in Mrs. Cadena not having a wheelchair and falling while using crutches she was unable to use, and it was a moving force and cause of her falling and injuries.

     **b.**  **Referring to preferred providers and delaying treatment so the County pays less or so it does not have to pay at all for offsite healthcare.**

44.     Other examples of medical decisions based on non-medical factors to benefit of the County at the expense of adequate patient healthcare is found in an examination of the circumstances of not following up with UMC doctors' instructions for Mrs. Cadena to see an orthopedic surgeon

on June 26, and the cancellation of the surgery scheduled for July 18,. It can be inferred the decisions were made to delay or deny treatment so the County would pay less for off-site healthcare or not have to pay at all to properly treat Mrs. Cadena.

45.     In Corizon's response to the County's request for qualifications is the scope of the services to be provided to prisoners in the contract. Corizon twice stated it understood the financial responsibility for outpatient care belonged to the County, and stated as policy or custom that it would continue to work with County personnel to minimize the need for off-site care. SOF 22-23. Dr. Salazar admits one way to reduce expenses for off-site care is to not refer at all to offsite providers, and another possible way is to refer to providers who charge less. SOF 25.

46.     When Corizon and Dr. Salazar refer prisoners for offsite care, they refer them primarily to UMC Hospital and Texas Tech. SOF 24. UMC receives ninety to ninety-nine percent of the referrals to hospitals, but in 2014 it was paid less than Tenet Hospital. Texas Tech receives about eighty percent of the referrals and was the fourth highest paid off-site facility. SOF 24. This evidence shows consideration of the County's expenses are an incentive and a factor in referrals.

47.     When Mrs. Cadena was discharged from UMC Hospital, instructions were given that she followup with an orthopedic surgeon "in the morning"(June 26). Dr. Salazar knew the instructions, but he selected only one provider from which to try to make an appointment, and when he learned the first available was July 14, he accepted it and the delay of treatment for Mrs. Cadena without trying to get an earlier appointment with another doctor. He did this despite knowing Mrs. Cadena was seriously injured, in need of orthopedic care, and that delay could lead to complications. SOF 97-98, 101-103. Dr. Salazar knew the leg was fractured and malaligned, and that there was no tactile stimulus to the outside of her foot. SOF 103. He also knew the lack of tactile stimulus could be nerve damage or caused by swelling, and he agreed that in either case, it was a dangerous situation

for that limb part. SOF 103. He knew she was in pain. SOF 80-82, 85, 97-98, 101-102.

48.     It was obvious even to a layperson that an orthopedic surgeon's care was required. Mrs. Cadena describes her leg as "twisted" and "crooked" and "to the other side" and  with the foot facing the direction of the middle of her body. SOF 77, 80, 120. Nurse Fuentes saw the deformity of the leg and noted it in his sick call notes. SOF 82, 85. Dr. Salazar knew about the deformity from reading Nurse Fuentes' sick call notes, and he knew the deformity would not just disappear. SOF 102, 117. His only reason for not having anyone call for an earlier appointment with another surgeon was that "she already had an appointment with Texas Tech ortho, so there would really be no need." SOF 108. Dr. Salazar is not stupid. His record shows a preference for referring to Texas Tech, and he did not follow the instructions and had her wait nineteen days to see an orthopedic surgeon.

49.     The existence of actual knowledge of a serious risk to health can be inferred from treatment of some injuries. Similarly, custom or policy can also be inferred. In Lawson v. Dallas County, knowledge obtained from wound care was sufficient to support a judgment of a violation of right to adequate care. 286 F.3d 257, 262-263(5th Cir. 2002). In Fuller v. Harris County, a failure to take the prisoner for surgery for nineteen days was sufficient. 137 Fed. Appx. 667, (N.D. Tex. 2015). Nurses performed wound care on Mrs. Cadena's broken leg which showed obvious signs of need for orthopedic care. SOF 117-120. Many nurses saw her bedridden when administering medicine to sedate her. SOF 121-126. (See below.) Too many people knew for there not to be actual knowledge and a custom or policy of delaying or denying medical care.

50.     On July 17, Corizon cancelled Mrs. Cadena's surgery for July 18 and rescheduled it for July 22. The alleged reason was she had a court setting. The setting was for a judge's conference for her misdemeanor case. SOF 141. Before the cancellation, on July 16, Corizon's Director of Nurses, Marcela Aguilar, RN, sent an email to Jail Commander Vargas. While DON Aguilar did ask

for approval of the surgery, she informed Commander Vargas of non-medical matters to consider. She stated/misstated that Mrs. Cadena suffered a fracture prior to arrival at the jail, and informed him of her criminal charges. SOF 140. DON Aguilar attended Commander Vargas' weekly staff meetings. In one meeting she informed him of the complexity of Mrs. Cadena's surgery. SOF 136. The information given in the meeting and email set in motion Commander Vargas's effort to get Mrs. Cadena released before her scheduled surgery. In a response to the email, he focused on DON Aguilar's statement the injury occurred prior to incarceration. SOF 140. He says he tried to get her released for humanitarian reasons, but is unable to explain why, except to say it was a complicated surgery and being out of jail would make it easier for her to get to appointments. SOF 137-139. However, he knew the surgery would be paid by the Sheriff, and by his actions he was trying to avoid the surgery. SOF 130, 138.

51.     Corizon and Dr. Salazar's "cooperation" with the County to reduce costs of offsite healthcare runs hand in hand with its delaying treatment. Consideration of non-medical factors in its medical decisions, was a deliberate indifference to Mrs. Cadena's serious medical needs. The harm caused by this consideration is discussed elsewhere in this response. One thing to be mindful of is that Corizon and Dr. Salazar had to deal with Mrs. Cadena's pain and her complaints of pain.

**(vi)     The sedation of Mrs. Cadena in the jail medical clinic was a condition of confinement and a deliberate indifference to her serious medical needs that was a moving force and cause of harm to her.**

52.     The medicine prescribed by Dr. Salazar did not relieve Mrs. Cadena's pain. She was in severe pain from June 27 through July 1. SOF 111, 115-116, 125. Someone prepared a Health Services Request that has her forged signature. SOF 109, 121. The resulting Initial Psychiatric Evaluation shows Corizon's nurse practitioner prescribed psychotropic medicine for the alleged chief complaint of "Yes Mam." SOF 121. Despite having reviewed the medical records, Dr. Salazar

testified he had never seen it before. He said, "I don't know what code word it could be." When shown a psychiatric evaluation for another prisoner that noted the chief complaint was "No mam," he said he did not know what that meant. SOF 122. One of the prescribed psychotropic medicines, Vistaril, is an antihistamine similar to Benadryl. Like Benadry it is a sedative. SOF 123. One has to wonder if she was sedated not only for pain, but also to keep her quiet and not complain.

53.     The chart for the administration of medicine to Mrs. Cadena in July is missing from her medical records. There is no explanation for it not being there. SOF 124. The Practitioner's Orders shows the medicines were prescribed. SOF 112, 121. The only evidence of administration of medicine in July is from Mrs. Cadena's testimony and her declaration. SOF 125. She says the pain medicine given in the first few days after she returned from UMC was not enough to relieve the pain, and then they began giving her the medicines that would make her sleep. SOF 121-126. Many nurses administered the medicines. Sometimes she would just wake up, and then they would give her the medicine to make her sleep. She lost days because of this practice. She was unable to go to the sun porch, library, ministry, and could only have visitation one time. SOF 121-126.

54.     Because of the sedation, Mrs. Cadena missed meals, was unable to move in general, unable to go to the library, attend educational and religious programs, shower, enjoy indoor and outdoor recreation time, and converse with other prisoners. She was unable to go to the sun porch, library, ministry, and could only visit with family one time. SOF 151.

Too many people in the jail knew there was a patient with a broken leg who was not being properly treated with surgery for there not to be any liability on the part of Corizon and Dr. Salazar.

## V. CONCLUSION

The Court should deny Defendants' motion for summary judgment and allow the case to go to trial on all of Plaintiff's claims.

Respectfully submitted,

PERRY PINON
Attorney for Plaintiff
State Bar No. 16016350
1312 Montana Avenue
El Paso, Texas   79902
(915)  546-9190
FAX  546-9192
perrypinonatty@aol.com

## CERTIFICATE OF SERVICE

I  hereby certify that on this the ___15___ day of ___SEPT___ 20_17_, Plaintiff's Response to Defendant Salazar and Corizon's Motion for Summary Judgment was served on Defendant CORIZON HEALTH INC, and Defendant ALEX SALAZAR, by and through their attorneys of record, Henry J. Paoli and Francisco J. Ortega and the law firm of Scott Hulse, P.C., 1100 Case Tower 201 E. Main Dr., El Paso, Texas 79901, Tele: 915.533.2493; Fax: 915.546-8333; hpao@scotthulse.com, and Defendant EL PASO COUNTY by and through its attorneys of record, Kevin McCary and Jo Anne Bernal, El Paso County Attorney, 500 E. San Antonio, Rm. 503, El Paso, Texas  79901, Tele: 915.546.2083; Fax: 915.546.2133; kmccary@epcounty.com, and in the following manner:

Hand delivery to Henry Paoli:___X_____

Perry Pinon